HERBERT J. MUIR & others *vs.* CITY OF LEOMINSTER
& others.

Worcester.    September 9, 1974. — October 8, 1974.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Public Land. Municipal Corporations,* Real property. *Statute,* Construction. *Mandamus.*

Land given a city by a private party without restrictions on its use and never formally dedicated by the city to a particular use was not "devoted to one public use," within the meaning of *Robbins* v. *Department of Pub. Works,* 355 Mass. 328, 330 (1969), regardless of how it had been used; the city could lawfully convey it to a different private party for a new and inconsistent use without authority from the Legislature. [591-592]

The procedures in G. L. c. 40, § 15, to be followed before a city or town conveys public land to a private party apply only to land which the city or town took by eminent domain. [592-593]

Review of the legislative history of G. L. c. 40, § 15. [593-596]

Where a city sold land to a private party who allegedly failed to perform conditions in the deed necessary to prevent reversion of title to the city, this court would not compel the city to file a writ of entry in the Land Court to obtain possession and establish title. [596-597]

PETITION for writ of mandamus filed in the Superior Court on October 27, 1971.

The case was heard by *Meagher, J.*

*Thomas B. Arnold* for the petitioners.

*Joseph Pellegrini,* Assistant City Solicitor, for the city of Leominster.

*Gregory J. Angelini* for Clarence E. Gagne & others.

HALE, C.J. This is a petition for a writ of mandamus brought by residents of Leominster against the city of Leominster (city), its mayor, the members of its council (council), and Clarence E. and Doris Gagne (Gagne). Following a trial a judge of the Superior Court made findings of fact and ordered the petition dismissed. The petitioners appealed from that order. The case is before us with a transcript of all the testimony and the exhibits which were before the court. Thus, all questions of law, fact and discretion are open for our decision. From this evidence we can find facts not expressly found by the judge and, if convinced that he was plainly wrong, we can find facts contrary to his findings. *Crawford* v. *Building Insp. of Barnstable,* 356 Mass. 174, 175 (1969).

By a deed dated August 25, 1935, one Fred A. Whitney conveyed to the city a parcel of land (Whitney Field) consisting of about eight acres, six of which are the subject of the present litigation. The deed, which was a warranty deed in statutory form, recited that the conveyance was "for consideration paid." It does not appear to be disputed that the transaction was in fact a gift. There was no limitation on the city's use of this

property set out in the deed or in the vote of the council accepting the conveyance. From 1935 to 1965 all of Whitney Field was used for playground and recreational purposes by the people of the city. A swimming pool, basketball court and an arts and crafts pavilion were built in a two-acre area, the surface of which was relatively even. The remaining six acres were used by the people for recreational purposes such as hiking, winter sliding, nature walks and picnicking. During this time Whitney Field was first operated by the playground commission and subsequently by the recreation commission. In 1964 the council passed an ordinance establishing the recreation commission (commission). Section 5 of this ordinance provides that the commission shall have the "control of the public playgrounds and recreation centers of the city." It appears that this ordinance is still in effect. For some time prior to 1965 and continuing thereafter, the playground buildings and swimming pool were subject to extensive damage from vandalism which led to the commission's recommending in 1965 that the pool be closed and the play equipment be removed. This recommendation was made in part by reason of a water shortage as well as the damage to the pool and other facilities. It appears that thereafter Whitney Field was not officially used for playground or recreational purposes, although the commission did subsequently discuss the future use of Whitney Field and as late as 1970 voted to retain the land as an "open green spot." The commission made no determination that there was no further need of the land for playground or recreational purposes.

In 1968 and 1969 Gagne made overtures to the council and the commission with a view to acquiring part of Whitney Field for use in connection with a commercial venture operated by him on abutting land to the west. In 1970 the council adopted an order under which six acres of Whitney Field would be sold to Gagne, which order included a determination that the land "is no longer

required for public purposes, namely, playground purposes." The order further provided that the purchase price would be $4,000 and that the conveyance would be conditioned, among other things, on Gagne's relocating a stream on the property, tearing down the buildings, removing the pool, and grading parts of the area to be retained by the city. The order further provided that "the deed of conveyance shall contain a reversionary clause wherein the land to be conveyed shall revert to the city in the event that any of the terms of this order are violated. Said reversion shall be automatic . . .." The time limit for the performance of all of these conditions was set at one year from the date of the deed, except for the relocation of the stream, which was to be completed within two years after certain State approval was obtained. The deed conveying the property, signed by the mayor on behalf of the city on August 25, 1970, contained all the conditions set out in the order of the council with the same limitations as to time for performance and for automatic reversion to the city if the conditions should not be performed as scheduled.

On September 2, 1970, a group of residents of Leominster brought a petition for a writ of mandamus to compel the mayor and the council to place the order for the sale of the premises on the agenda of their next meeting for further consideration in accordance with provisions of the city charter and to obtain certain injunctive relief. This petition was dismissed by the Superior Court on December 22, 1970. The petitioners filed a timely appeal but on October 20, 1971, filed a waiver of that appeal. On October 25, 1971, judgment was entered for the respondents.

On June 28, 1971, while that litigation was pending, the city, by its mayor, made an agreement with Gagne which purported to extend the time for the performance of all of the conditions in the deed from the city to Gagne to "one (1) year after the final decision by the Massachusetts Supreme Judicial Court" in the then

pending case. As consideration for that agreement, Gagne agreed to convey to the city an acre of land adjacent to the two acres of Whitney Field retained by the city. The agreement also provided that should the decision of the Supreme Judicial Court be in favor of the petitioners, the obligation of Gagne to convey that one acre to the city would become null and void. The present petition was filed on October 27, 1971. The petitioners in the present case are not the same as those in the prior case, although they are represented by the same counsel.

Although entitled a petition for a writ of mandamus, the petition before us, except for one prayer, is essentially a petition for declaratory relief with respect to the validity of the deed from the city to Gagne. The petitioners contend that the conveyance is void for either of the following reasons: (1) that the conveyance was a diversion of park or kindred public land from a public use to a new and inconsistent private use without the city's having first obtained the necessary authority from the General Court; and (2) that the requirements of G. L. c. 40, § 15, were not complied with in that the commission which had charge of the land made no determination that the land was no longer required for public purposes and consequently did not notify the council of any such determination.

As to the petitioners' first contention, while it is the rule that "public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion" (Robbins v. Department of Pub. Works, 355 Mass. 328, 330 [1969]), that rule applies only to those lands which are in fact "devoted to one public use." Whitney Field does not meet this criterion.

In this case there had been neither prior legislative authorization of a taking for a particular public purpose nor a prior public or private grant restricted to a particular public purpose. The deed through which the city

acquired title to the property was an unrestricted deed, not a limited grant for a particular use or purpose. There was no formal dedication by the city of this area as park land.[1]

Thus, while a portion of Whitney Field was used by the city for a time as a playground, the city was under no compulsion to use the land either for that purpose or for any other particular purpose. Instead, Whitney Field was held by the city as part of its general corporate property and could be used for different purposes in the event of changes in the nature or the needs of the municipality. The cases relied on by the petitioners are inapposite as the land in this case was not acquired for a limited purpose.

Conveyance of the land by the city is thus governed by the general provisions regulating the power to hold, lease and convey property found in G. L. c. 40, § 3 (made applicable to cities by G. L. c. 40, § 1), as limited by the conditions set out in G. L. c. 40, § 15, if applicable.

The petitioners' second contention assumes the applicability of G. L. c. 40, § 15, and charges that the requirements of that section as to the proper procedures to be followed for the conveyance of land were not complied with by the city.

However, § 15, dealing with the procedures for abandonment of land or easements, applies only to "any land . . . taken for such city or town, otherwise than by purchase." The city argues that § 15 is applicable only to the abandonment of land taken by eminent domain and that since Whitney Field was not taken by eminent domain, the procedures outlined in § 15 were not applicable. The petitioners, in contending for the applicability of § 15, assume a broad reading of that section to

---

[1] The use of the phrase "parklands, Great Ponds, reservations and kindred areas" in *Robbins* v. *Department of Pub. Works, supra,* at 331, is not helpful to the petitioners as it was apparently intended to include only other types of areas which the Legislature has specifically identified with or restricted to a particular public use.

include all modes of acquiring land (e.g., taking by eminent domain, deed or devise), excluding only purchase. There has been no determination by the Supreme Judicial Court as to the scope of this section.

While the quoted language of § 15 could, if read literally, bear the meaning assumed by the petitioners, our consideration of the legislative history, of the subsequent statutory treatment, and of the apparent public policy or purpose of the section, leads us to the conclusion that the word "taken" in § 15 is used in the more narrow, but traditional, sense of "taken by eminent domain."

What is now G. L. c. 40, § 15, was originally Senate Bill No. 247, reported on April 1, 1901, by the Joint Committee on the Judiciary. 1901 Senate Doc. No. 247. That bill was a response by the Joint Committee to a petition for legislation authorizing cities and towns "to sell and convey lands taken under the right of eminent domain," and apparently was reported after consideration of two other bills on the subject. 1901 Senate Doc. Nos. 81 and 82. While the earlier two bills specifically referred to lands "taken under the right of eminent domain," with the bill reported (No. 247) referring only to land "taken," and adding the exception "otherwise than by purchase," the major difference among the bills seems to have been the addition of two more conditions in No. 247: (1) that whenever a board or authority should have charge of the land taken, it would be required to notify the city council or selectmen that the land was no longer required for public purposes before any vote by the council or selectmen on abandonment, and (2) that a minimum sum to be paid for the land be specified.

We believe that the Joint Committee used the word "taken" in No. 247 in its accepted and traditional meaning of "taken by eminent domain." A comparison of the legislative history of the provision immediately preceding § 15, G. L. c. 40, § 14, authorizing the taking by

eminent domain or purchase of land by cities and towns, reveals that it was not until 1921 that the phrase "by eminent domain" appeared.[2]   In fifteen previous amendments, from 1848 to 1918, the word "taken" (or "take" or "taking") was used in isolation, in a context and with a clear intention to refer to taking by eminent domain.[3]

The subsequent statutory treatment of what is now § 15, through two major recodifications and one further updating, indicates a legislative understanding that this section logically and substantively belonged with those sections dealing with takings by eminent domain.

Although what is now § 15 had been too recently enacted to be included or discussed in the report of the Commissioners for Consolidating and Arranging the Public Statutes,[4] the supplemental report of the commissioners relative to statutes passed in 1901 recommended that the section be placed after a group of five other sections,[5] all using the unmodified words "take" or "taking," and all clearly dealing with the power to take

---

[2] See St. 1921, c. 486, § 7.

[3] See St. 1848, c. 237, § 1 ("An Act to authorize towns to take land for schoolhouses"); St. 1851, c. 186; St. 1855, c. 318; Gen. Sts. (1860) c. 38, § 38; St. 1869, c. 411, § 1 ("An Act to authorize cities and towns to take land for certain public uses"); St. 1874, c. 342; Pub. Sts. (1881) c. 44, § 48; St. 1894 c. 145 ("An Act to authorize the taking of land for public library buildings"); St. 1897, c. 299, §§ 1, 4; St. 1899, c. 379, §§ 1, 4 ("An Act relative to the taking of land by cities and towns"); St. 1900, c. 437; R. L. (1902) c. 25, §§ 45-50; St. 1915, c. 143; St. 1915, c. 263 ("An Act relative to the taking of land by cities and towns for municipal purposes"); St. 1918, c. 291, §§ 6, 8.   Compare Nichols, Eminent Domain (rev. 3d ed.), § 6.1 [1], discussing the construction of "taken" in the United States and various State constitutions.

[4] See Report of the Commissioners for Consolidating and Arranging the Public Statutes, vii (1901).

[5] Supplemental Report of the Commissioners for Consolidating and Arranging the Public Statutes (1901) p. 32; § 15 was then numbered § 45A.

or method of taking land by eminent domain by cities or towns.[6]

The next major recodification, in 1921, continued to evince this understanding of the Legislature by again locating what had by then become § 15 after § 14, which consolidated and broadened prior sections on the taking by eminent domain or purchase of land by cities or towns.[7]

Thus, the legislative history of G. L. c. 40, § 15, leads us to the conclusion that § 15 was initially intended, and has been subsequently considered, to be a logical part of a sequence of sections regulating the taking of land by eminent domain and the subsequent disposition of land so taken.

In addition, this legislative intention is confirmed by a consideration of the apparent purpose of § 15. "In construing a statute and arriving at the intention of the legislature, not only must the words used be considered, but the purpose to be accomplished is also to be regarded." *Nickels* v. *Scholl,* 228 Mass. 205, 209 (1917). See also *Moore* v. *Stoddard,* 206 Mass. 395, 399 (1910); *Commonwealth* v. *Dee,* 222 Mass. 184, 187 (1915); *Morse* v. *Boston,* 253 Mass. 247, 252 (1925); *Chipman* v. *Massachusetts Bay Transp. Authy.* 366 Mass. 253, 256 (1974); L. Fuller, The Morality of Law (2d ed.), 228-229. Similarly, see 2A Sutherland, Statutory Construction (4th ed.), § 45.09, at 29. The enumeration of three conditions in § 15 indicates a desire to limit the ease of conveyance of certain land acquired by cities or towns. A taking by eminent domain is a drastic exercise of the power of government. It should be invoked only after

---

[6] These five sections were numbered §§ 41-45; they were later renumbered, and, with the addition of what is now § 15, formed a sequence of six sections on the taking of land by cities and towns, R. L. (1902) c. 25, §§ 45-50.

[7] Report of the Joint Special Committee on Consolidating and Arranging the General Laws, Vol. I, c. 40-1 (1920).

there has been a considered determination that particular
land is needed for a specific public purpose. Section 15
reflects a legislative policy that before land so acquired
can be disposed of there must be a considered deter-
mination that the land is no longer required for the
specific purpose or for any other public purpose. As the
necessity for regulating the acquisition and disposition of
land taken by eminent domain seems more apparent than
regulation of land acquired, for example by deed or
devise (which are both privately-motivated voluntary
transactions with the governmental power a relatively
passive recipient), the conditions of § 15 may be more
logically interpreted as intended to apply to the tradi-
tional meaning of "taken," taken by eminent domain.

Finally, the petitioners pray that a writ of mandamus
issue "ordering the city of Leominster to file forthwith a
Writ of Entry in the Land Court and prosecute the same
in a vigorous and diligent manner to recover legal title
in said property." We assume that the petitioners in-
tended that by such a proceeding it would be established
that Gagne had failed to perform the conditions in the
deed from the city and that title had thereby reverted to
the city.

If a reverter has occurred, the means which the city
may use to obtain possession and to establish that title has
reverted to it could well depend upon the circumstances.
It may well be that litigation would not be required. On
the other hand, resort could be had to an action to
recover land under G. L. c. 237, §§ 1-8, as amended by
St. 1973, c. 1114, § 227, or to an action under G. L.
c. 240, § 1. What procedure might be selected would be
for the appropriate city officials to determine in the light
of the existing facts. A court should not substitute its
judgment as to the appropriate procedure to be followed.
*Channel Fish Co., Inc.* v. *Boston Fish Mkt. Corp.* 359
Mass. 185, 187-188 (1971).

The trial judge made no finding as to whether the city
or any of its officials had neglected or refused to perform

any duty, the performance of which was required by law. See *Kaplan* v. *Bowker*, 333 Mass. 455, 460 (1956). The record before us does not permit, let alone require, such a finding. Relief under this prayer was properly refused.

*Order dismissing petition affirmed.*