SANJOY MAHAJAN & others[1] vs. DEPARTMENT OF
ENVIRONMENTAL PROTECTION & another.[2]

Suffolk. November 5, 2012. - March 15, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

Department of Environmental Protection. Redevelopment of Land. Urban
   Renewal. Harbors. Parks and Parkways. Constitutional Law, Taking of
   property. Due Process of Law, Taking of property, Commonwealth's inter-
   est in tidelands.

This court concluded that the Department of Environmental Protection (depart-
      ment) did not act unconstitutionally and beyond its statutory authority
      when, without first obtaining a two-thirds vote of the Legislature as required
      by art. 97 of the Amendments to the Massachusetts Constitution, the
      department issued a waterways license, pursuant to G. L. c. 91, to the
      Boston Redevelopment Authority (authority) to redevelop a section of land
      owned by the authority on the seaward end of Long Wharf in Boston
      (project site), where the project site was not "taken" for art. 97 purposes,
      in that, while the project site displays some attributes of a park and serves
      the purpose of the utilization of natural resources (given that it promotes
      access to the waterfront and the sea), that use is incidental to the overarch-
      ing purpose of urban renewal for which the land (including the project
      site) was originally taken [611-620]; further, this court noted that even if
      art. 97 applied to the project site, the department's issuance of the license
      did not convey a property right and thus did not constitute a disposition or
      change in the use of the land triggering the two-thirds vote requirement
      [620-622].

CIVIL ACTION commenced in the Superior Court Department on
February 26, 2010.

The case was heard by Elizabeth M. Fahey, J., on motions
for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

---

[1]Victor Brogna, Stephanie Hogue, David Kubiak, Mary McGee, Anne M.
Pistorio, Thomas Schiavoni, Pasqua Scibelli, Robert Skole, and Patricia
Thiboutot.

[2]Boston Redevelopment Authority (BRA).

*Denise A. Chicoine* for Boston Redevelopment Authority.

*Annapurna Balakrishna,* Assistant Attorney General, for Department of Environmental Protection.

*Gregor I. McGregor (Michael J. O'Neil & Luke H. Legere* with him) for the plaintiffs.

The following submitted briefs for amici curiae:

*Heather Maguire Hoffman* for Shirley Kressel.

*Thomas B. Bracken* for The Sierra Club.

*Peter Shelley & John A. Pike* for Conservation Law Foundation, Inc., & others.

CORDY, J. This action arises from the Department of Environmental Protection's (department's) issuance of a waterways license under G. L. c. 91 (chapter 91 license) to the Boston Redevelopment Authority (BRA) to redevelop a section of land owned by the BRA on the seaward end of Long Wharf (project site). The plaintiffs, ten residents of Boston's North End neighborhood, appealed the issuance of the chapter 91 license to the department's office of appeals and dispute resolution, and ultimately to a judge in the Superior Court, claiming the department acted unconstitutionally and beyond its statutory authority when it issued the chapter 91 license without obtaining a two-thirds vote of the Legislature as required by art. 97 of the Amendments to the Massachusetts Constitution.[3] On cross motions for judgment on the pleadings, the motion judge ordered declaratory relief and issued a writ of mandamus ordering the department to enforce art. 97. We granted the BRA's application for direct appellate review. We are presented with two principal questions: Whether the project site, which the BRA took by eminent domain for urban renewal purposes, is subject to art. 97; and if art. 97 does apply, whether the department may issue the chapter 91 license to the BRA without triggering the requirement of a two-thirds vote of the Legislature. We conclude that the project site is not subject to art. 97.[4]

1. *Background.* a. *The BRA and the 1964 urban renewal plan.*

---

[3]Article 97 of the Amendments to the Massachusetts Constitution, approved and ratified on November 7, 1972, superseded art. 49 of the Amendments, but preserved the right of the people to enjoy the natural resources of the Commonwealth. We refer to the provision as art. 97.

[4]We acknowledge the amicus briefs submitted by Shirley Kressel and the

The BRA is both a "redevelopment authority" under G. L.
c. 121B, § 4, and an "urban renewal agency" under G. L.
c. 121B, § 9.[5] Additionally, it serves as the planning board for
the city of Boston and monitors private development under
G. L. c. 121A. See St. 1960, c. 652, §§ 12-14.

The BRA's urban renewal powers and duties are enumerated
throughout G. L. c. 121B, particularly in § 11 and §§ 45-57A.
The legislative goals of G. L. c. 121B are to "eliminat[e]
decadent, substandard, or blighted open" areas and to promote
sound community growth. G. L. c. 121B, § 45. See G. L.
c. 121B, § 1 (defining decadent, substandard, and blighted open
areas). The BRA is vested with the authority to effectuate the
goals of urban renewal through land assembly, title confirmation,
public financial assistance, and development and design controls,
all of which enable the BRA to guide private sector development
toward areas in need. See G. L. c. 121B, §§ 46-57A. Perhaps
the most significant power granted to the BRA is the power of
eminent domain, which G. L. c. 121B confers on the BRA as is
"necessary or reasonably required to carry out the purposes of
[c. 121B]," G. L. c. 121B, § 11 (d), such purposes being the
elimination of "decadent, substandard or blighted open con-
ditions." G. L. c. 121B, § 45.[6]

Pursuant to the Downtown Waterfront-Faneuil Hall urban

---

Sierra Club, as well as the brief submitted by the Conservation Law Founda-
tion, the Massachusetts Association of Conservation Commissions, the Nature
Conservancy, and the Trustees of Reservations.

[5]A thorough comparison of the BRA's role in G. L. c. 121A urban redevelop-
ment projects versus its role as an urban renewal agency in G. L. c. 121B
urban renewal projects can be found in *Boston Edison Co.* v. *Boston Redev.
Auth.*, 374 Mass. 37, 50-53 (1977). See *Boston Redev. Auth.* v. *Charles River
Park "C" Co.*, 21 Mass. App. Ct. 777, 782-783 (1986).

[6]General Laws c. 121B grants the power of eminent domain to urban renewal
agencies and otherwise provides for the acquisition and disposition of land
pursuant to the purposes of urban renewal. A number of statutory sections
discuss this power. General Laws c. 121B, § 11, provides: "Each operating
agency shall have the powers . . . (d) To take by eminent domain . . . any
property, real or personal, or any interest therein, found by it to be necessary
or reasonably required to carry out the purposes of this chapter."

General Laws c. 121B, § 45, provides:

> "It is hereby declared . . . that the acquisition of property for the
> purpose of eliminating decadent, substandard, or blighted open condi-
> tions thereon and preventing recurrence of such conditions in the area,

renewal plan, dated April 15, 1964 (1964 urban renewal plan), and an order of taking, dated June 4, 1970, which incorporated that plan, the BRA acquired the project site in 1970 as part of a larger taking by eminent domain of the Long Wharf area (1970 taking). In accordance with the legislative goals of G. L. c. 121B, the 1964 urban renewal plan provides in Section 201:

> "The basic goal of urban renewal action in the Downtown Waterfront-Faneuil Hall Area is to stimulate and to facilitate development efforts in the area, by eliminating those severe conditions of blight, deterioration, obsolescence, traffic congestion and incompatible land uses which hinder private investment in new development without the aid of governmental action, in order to (1) revitalize a key portion of downtown Boston; (2) upgrade the pattern of land uses close by the North End residential community; (3) establish a functional connection between the area and its surrounding districts: the North End, the Government Center and the Financial District; and (4) provide an environment suitable to the needs of contemporary real estate development."[7]

the removal of structures and improvement of sites, the disposition of the property for redevelopment incidental to the foregoing, [and] the exercise of powers by urban renewal agencies . . . are public uses and purposes for which public money may be expended and the power of eminent domain exercised . . . ."

General Laws c. 121B, § 47, provides:

"Notwithstanding any contrary provision of this chapter, an urban renewal agency may . . . take by eminent domain, as provided in clause (*d*) of section eleven . . . or acquire by purchase, lease, gift, bequest or grant, and hold, clear, repair, operate and, after having taken or acquired the same, dispose of land constituting the whole or any part or parts of any area which . . . it has determined to be a decadent, substandard or blighted open area and for which it is preparing an urban renewal plan . . . ."

[7]Section 202 of the Downtown Waterfront-Faneuil Hall urban renewal plan, dated April 15, 1964 (1964 urban renewal plan), also outlines several planning objectives, which are as follows:

"(1) To eliminate a pattern of land uses and blighting conditions which

"(a) creates severe traffic congestion in the area;

"(b) exerts a depressing effect on adjacent areas;

b. *The project site.* The project site is a section of land at the eastern end of Long Wharf on which sits an open-air brick structure known as Long Wharf Pavilion. The BRA continues to hold and maintain Long Wharf, including the project site, pursuant to the 1964 urban renewal plan.[8] Long Wharf is a designated national historic landmark, and is the site of water transportation, public transportation, hotels, retail establishments, and

"(c) inhibits the development of real property to its fullest economic potential.

"(2) To eliminate obsolete and substandard building conditions which are a factor in spreading blight to adjacent areas.

"(3) To prevent the further erosion of property values.

"(4) To protect and strengthen the tax base of the city.

"(5) To encourage productive and intensive use of land.

"(6) To create opportunities for development of a downtown residential community offering a range of housing types and rentals.

"(7) To provide sites suitable for the construction of efficient, economical buildings.

"(8) To promote the preservation and enhancement of buildings in the Project Area which have architectural and historical significance.

"(9) To create an environment which is conducive to the investment of funds in rehabilitation, conversion and general upgrading of property.

"(10) To create an area with a mixture of land uses compatible with living, working and recreational opportunities.

"(11) To create an area for the development of marine or marine-oriented activities designed to stimulate tourism and symbolize the importance of Boston's historic relationship to the sea.

"(12) To provide for the efficient flow of traffic within and through the area.

"(13) To improve streets and utilities and the landscaping of public areas.

"(14) To provide public ways, parks and plazas which encourage the pedestrian to enjoy the harbor and its activities.

"(15) To develop the area in such a way as to stimulate improvements in adjacent areas."

[8]Although the 1964 urban renewal plan specified a forty-year effective period, the plan was amended in 2004 to be effective through April 30, 2015.

restaurants. It is also part of the Boston Harborwalk, a pedestrian walkway that lines the waterfront.

In 1983, the department[9] permitted the Massachusetts Bay Transportation Authority to construct an emergency egress and ventilation shaft for the Blue Line subway tunnel, to be capped off by the structure now known as Long Wharf Pavilion. At the same time, the BRA undertook renovations to the plaza area surrounding the pavilion. The plaza measures approximately 33,000 square feet, is paved with granite flagstones, and features a large inlaid compass rose to the south of the pavilion. Other features include benches, public binoculars, and a flag pole. A segment of the Harborwalk lines the perimeter of the plaza. Although not discussed in much detail in the 1964 urban renewal plan, the plaza's current use is consistent with the plan's provision for an "observation platform" on Long Wharf.

In addition to the 1964 urban renewal plan, the project site is also subject to Boston's Municipal Harbor Plan, which was approved in 1991 by the Secretary of the Executive Office of Environmental Affairs pursuant to 301 Code Mass. Regs. §§ 23.00 (2000) (municipal harbor plan). Among other objectives, the municipal harbor plan calls for the activation and revitalization of Boston's underutilized shoreline "by promoting growth through private investment that is appropriately designed, and is a balanced mix of uses that bring vitality to the waterfront and public benefits and amenities that are shared by all Boston residents." The municipal harbor plan was designed to complement waterways regulations that accompanied G. L. c. 91, already applicable to much of the waterfront area.

Considering the project site to be underutilized, the BRA proposed a plan in 2008 to redevelop it by enclosing and expanding the pavilion to accommodate a restaurant with outdoor seating, "takeout service," and a bar. Specifically, the BRA planned to expand the 3,430 square foot pavilion by 1,225 square feet. In addition to the restaurant, the proposed redevelopment includes shaded seating, restrooms, and several sets of binoculars, all available to the public independent of patronage of the restaurant. The proposed redevelopment is intended to allow year-round

[9]The Department of Environmental Protection (department) was then referred to as the Department of Environmental Quality Engineering.

use of the pavilion and provide facilities and seating to the large
number of pedestrians and water transit users who frequent the
area.

The BRA obtained fourteen zoning variances from the Boston
zoning board of appeals that allow for live entertainment,
"takeout service," and food and alcohol service until 1 A.M. at
the proposed restaurant. In addition, because the project site is
located on filled tidelands, the BRA was required to obtain the
chapter 91 license from the department. See G. L. c. 91, § 14;
310 Code Mass. Regs. §§ 9.00-9.55 (2012). See also *Moot* v.
*Department of Envtl. Protection*, 448 Mass. 340, 342 (2007),
*S.C.*, 456 Mass. 309 (2010) (discussing applicability of G. L.
c. 91, which governs development on tidelands).

The department granted the chapter 91 license to the BRA on
September 17, 2008. The plaintiffs appealed. They argued that
the proposed restaurant would create unnecessary noise and
would damage public open space, parkland, and scenic quality.[10]
On January 29, 2010, the commissioner of the department is-
sued a final decision affirming the issuance of the chapter 91
license.[11] The plaintiffs appealed from that final decision to the
Superior Court, seeking a declaratory judgment under G. L.
c. 231A and a writ of mandamus under G. L. c. 249, § 5, order-
ing the department to enforce the requirements of art. 97 by
seeking a two-thirds vote of the Legislature prior to issuing the
license. The motion judge concluded that because the 1964
urban renewal plan aimed to create parkland, open space, and a

---

[10]The standard for granting a waterways license under G. L. c. 91 (chapter
91 license) for a nonwater dependent use (like the proposed restaurant) on
filled tidelands is a finding by the department that the use "shall serve a
proper public purpose and that said purpose shall provide a greater public
benefit than public detriment to the rights of the public in said lands." G. L.
c. 91, § 18.

[11]The plaintiffs filed their appeal from the department's office of appeals and
dispute resolution (OADR) on October 9, 2008, and at a prescreening confer-
ence on December 3, 2008, the parties established a list of issues for resolution.
Those issues pertained only to the chapter 91 license and did not include the art.
97 issue. In a motion for summary decision filed during the appeals process on
February 24, 2009, the plaintiffs raised the art. 97 issue for the first time. The
BRA and the department countered by asserting that art. 97 is outside the
department's express statutory authority. Based on that assertion, the OADR
hearing officer (and, by adoption, the commissioner of the department) declined
to consider the issue, and it was litigated for the first time in the Superior Court.

means of utilizing and enjoying the harbor, it served art. 97 purposes and was therefore subject to art. 97. The judge further concluded that the issuance of the chapter 91 license constituted a transfer of legal control from the department to the BRA sufficient to effect a disposition, as well as a change in use of the land, both of which triggered the two-thirds vote requirement. Accordingly, the judge granted the plaintiffs' requested relief.[12]

On appeal, the plaintiffs contend that the project site is subject to art. 97, and that the department's issuance of the chapter 91 license constituted a use or disposition triggering the two-thirds vote requirement. The BRA counters that art. 97 does not apply because the project site was not taken for art. 97 purposes. The department argues that it lacks the authority to interpret and apply art. 97, and that even if art. 97 did apply, the department's issuance of the chapter 91 license did not constitute a use or disposition triggering the vote requirement. Both defendants argue that the motion judge improperly voided the chapter 91 license through declaratory and mandamus relief.

2. *Discussion.* a. *Applicability of art. 97.* Article 97 was approved and ratified on November 7, 1972, superseding art. 49 of the Amendments. See note 3, *supra.* It provides, in pertinent part, as follows:

> "The people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and *the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.*
>
> "The general court shall have the power to enact legislation necessary or expedient to protect such rights.

---

[12]The plaintiffs also invoked G. L. c. 30A, § 14, arguing that the commissioner's decision was based on an error of law, and that issuance of the chapter 91 license was in contravention of G. L. c. 91 statutory and regulatory requirements. See note 10, *supra.* Because the judge disposed of the case on art. 97 grounds, she did not consider the plaintiffs' request for G. L. c. 30A review. Because the propriety of the chapter 91 license (apart from the potential art. 97 issue) was not reviewed in the Superior Court, it is not properly before us on appeal.

"...

"Lands and easements *taken or acquired for such pur-poses* shall not be used for other purposes or otherwise disposed of except by laws enacted by a two-thirds vote, taken by yeas and nays, of each branch of the general court." (Emphases added.)

The principal issue in this case concerns whether the project site, which the BRA took by eminent domain in 1970, was "taken" for art. 97 purposes. See *Selectmen of Hanson* v. *Lindsay*, 444 Mass. 502, 504-506 (2005) (in order for art. 97 vote require-ment to apply, land must have been taken or acquired for art. 97 purposes). Article 97 clearly states that its purposes are "the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources." In contrast, land taken for urban renewal purposes is generally understood to be taken "for the purpose of eliminating decadent, substandard or blighted open conditions." G. L. c. 121B, § 45. See *Aaron* v. *Boston Redev. Auth.*, 66 Mass. App. Ct. 804, 807, 808, 810 (2006) (in context of claim for prescriptive easement, land taken by BRA for urban renewal purposes held for "other public purpose," not conservation). Although as a practical matter, certain aspects of an urban renewal plan may accomplish goals similar to those outlined in art. 97, the overarching purpose for which the land is taken is distinct from art. 97 purposes.

With that distinction in mind, the issue is whether the project site can nonetheless be characterized as having been "taken or acquired for [art. 97] purposes." Reported cases interpreting art. 97 are scarce. In concluding that the project site was taken for art. 97 purposes, the motion judge relied heavily on the June 6, 1973, opinion of then Attorney General Robert Quinn. See Rep. A.G., Pub. Doc. No. 12, at 139 (1973) (Quinn Opinion). Using the Quinn Opinion for guidance, she identified certain aims or objectives referenced in the 1964 urban renewal plan, including the creation of public ways, parks, open space, and plazas, and a means of utilizing and enjoying the harbor. Because those aims were consistent with the purposes of art. 97, the judge concluded that the project site, which realizes them, was taken for art. 97 purposes and is therefore subject to the two-thirds

vote requirement. Not surprisingly, the plaintiffs rely extensively on the Quinn Opinion in their arguments before this court.

The Quinn Opinion was issued in response to a general inquiry from the Speaker of the House of Representatives regarding the applicability of art. 97, and was rendered without reference to any particular set of facts. Although the Quinn Opinion is entitled to careful judicial consideration on the question of the scope of art. 97 and the intent of its drafters, see *Opinions of the Justices*, 383 Mass. 895, 918 (1981), citing Rep. A.G., Pub. Doc. No. 12, at 141 (concluding art. 97 applies retroactively), its interpretation of art. 97 is not binding in its particulars, and we are hesitant to afford it too much weight due to the generalized nature of the inquiry and the hypothetical nature of the response.[13] See A.J. Cella, Administrative Law and Practice § 20, at 70-75 (1986) (discussing legal effect of opinions of the Attorney General).

The Quinn Opinion suggests a more expansive reading of art. 97 than we afford it today, and it may reasonably be read to support the plaintiffs' argument that the project site is subject to art. 97. We disagree with the Quinn Opinion to the extent it suggests that the vast majority of land taken for any public purpose may become subject to art. 97 if the taking or use even incidentally promotes the "conservation, development and utilization of the . . . forest, water and air," Rep. A.G., Pub.

---

[13]It is highly unusual for an opinion of the Attorney General to be rendered on a hypothetical basis. See A.J. Cella, Administrative Law and Practice § 20, at 69 n.2 (1986) (Cella). Opinions of the Attorney General are rendered pursuant to G. L. c. 12, § 3, which provides for the rendering of legal advice by the Attorney General to State "departments, officers, and commissions" in matters relating to their official duties. Cella, *supra* at 69. "Opinions of the Attorney General are rendered solely upon factual situations which actually confront a given state department or agency, and not upon hypothetical questions or general requests for information." *Id.* at 69 n.2, citing Rep. A.G., Pub. Doc. No. 12, 114 (1967). An advisory opinion of the Attorney General "is entitled to careful judicial consideration and is generally regarded as highly persuasive." Cella, *supra* at 74 & n.37. However:

"[I]t is clear that the courts retain the power to determine for themselves on a case by case basis whether or not, and if so, to what extent, the courts agree or disagree with an advisory opinion of the Attorney General as to the proper interpretation of some issue of law."

*Id.* at 75.

Doc. No. 12, at 142, or that the land simply displays some attributes of art. 97 land generally.[14] *Id.* at 143. We also do not agree that the relatively imprecise language of art. 97 warrants

[14]Unconstrained by a particular set of facts, the then Attorney General, in Rep. A.G., Pub. Doc. No. 12 (1973) (Quinn Opinion) paints a broad picture of the scope of art. 97. In response to the question, "Does the disposition or change of use of land held for park purposes require a two thirds vote . . . as provided in [art. 97], or would a majority vote of each branch be sufficient for approval?" the Quinn Opinion answered, "Yes," and then went on to suggest that the actual use, appearance, or attributes of a piece of land may be better evidence of the purpose for which it was taken or acquired than the language of the instrument effectuating the acquisition. *Id.* at 143. Its most expansive language reads:

> "Th[e] question as to [the applicability of art. 97 to] parks raises a further practical matter in regard to implementing Article 97 which warrants further discussion. The reasons the Legislature employs to explain its actions can be of countless levels of specificity or generality and land might conceivably be acquired for general recreation purposes or for very explicit uses such as the playing of baseball, the flying of kites, for evening strolls or for Sunday afternoon concerts. *Undoubtedly, to the average man, such land would serve as a park but at even a more legalistic level it clearly can also be observed that such land was acquired, in the language of Article 97, because it was a 'resource' which could best be 'utilized' and 'developed' by being 'conserved' within a park. But it is not surprising that most land taken or acquired for public use is acquired under the specific terms of statutes which may not match verbatim the more general terms found in Article 10 of the Declaration of Rights of the Constitution or in Articles 39, 43, 49, 51 and 97 of the Amendments. Land originally acquired for limited or specified public purposes is thus not to be excluded from the operation of the two-thirds roll-call vote requirement for lack of express invocation of the more general purposes of Article 97. Rather the scope of the Amendment is to be very broadly construed,* not only because of the greater broadness in 'public purpose,' changed from 'public uses' appearing in Article 49, but also because Article 97 establishes that the protection to be afforded by the Amendment is not only of public uses but of certain express rights of the people.

> "Thus, all land, easements and interests therein are covered by Article 97 if taken or acquired for 'the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources' as these terms are broadly construed. *While small greens remaining as the result of constructing public highways may be excluded, it is suggested that parks, monuments, reservations, athletic fields, concert areas and playgrounds clearly qualify. Given the spirit of the Amendment and the duty of the General Court, it would seem prudent to classify lands and easements taken or acquired for specific purposes not found verbatim*

an interpretation as broad as the Quinn Opinion would afford it, particularly in light of the practical consequences that would result from such an expansive application, as well as the ability of a narrower interpretation to serve adequately the stated goals of art. 97.

The critical question to be answered is not whether the use of the land incidentally serves purposes consistent with art. 97, or whether the land displays some attributes of art. 97 land, but whether the land was *taken for those purposes*, or subsequent to the taking was designated for those purposes in a manner sufficient to invoke the protection of art. 97. See *Selectmen of Hanson* v. *Lindsay*, 444 Mass. 502, 508-509 (2005) (art. 97 protections may arise where subsequent to taking for purposes other than art. 97, land is "specifically designated" for art. 97 purpose by deed or other recorded restriction). See also *Toro* v. *Mayor of Revere*, 9 Mass. App. Ct. 871, 872 (1980) (applicability of art. 97 hinged on whether land had in fact been conveyed "to the conservation commission . . . to maintain and preserve it for the use of the public for conservation purposes"). In this case, while it can be argued that the project site displays some of the attributes of a park[15] and serves the purpose of the utilization of natural resources — in that it promotes access to the waterfront and the sea — this specific use is incidental to the overarching purpose of urban renewal for which the land including the project site was originally taken. Cf. *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 551-552 (1988), citing *Papadinis* v. *Somerville*, 331 Mass. 627, 632 (1954) (any benefit from disposition to private redeveloper of land taken for urban renewal purposes is "incidental to the main purpose of the plan, which is the elimination of a substandard, decadent, or blighted open area").

In *Selectmen of Hanson* v. *Lindsay, supra*, we held that a

---

in Article 97 as nevertheless subject to Article 97 if reasonable doubt exists concerning their actual status." (Emphases added.)

*Id.* at 142-143.

[15]As the motion judge noted, a bronze plaque located on the plaza designates the area as "Long Wharf Park," and the BRA's owned-land database identifies the area at the end of Long Wharf as a "park."

town meeting vote to designate for conservation purposes land that had originally been taken for tax purposes did not subject that land to art. 97 protections absent recordation of a restriction on the title. Without the execution or recordation of a deed containing the conservation restriction, the land "never became specifically designated for conservation purposes in the first instance" and accordingly "was not held for a specific purpose" under art. 97, so "compliance with the provisions of art. 97 . . . was not required." *Id.* at 508-509. This was true despite the clear intent of the town meeting members to hold the property for conservation purposes. *Id.* at 505. As the plain language of art. 97 indicates, for land to be subject to the two-thirds vote requirement on disposition or use for other purposes, it must be *"taken or acquired for [the] purpose"* of protecting interests covered by art. 97. In *Selectmen of Hanson* v. *Lindsay, supra* at 508-509, where the property had indisputably been acquired as a tax forfeiture and held as general corporate property, the town had to deed the land to itself for conservation purposes — or record an equivalent restriction on the deed — in order for art. 97 to apply to subsequent dispositions or use for other purposes. Here, where the land at issue is but a small part of a much larger taking effectuated for the purposes of urban renewal, it is difficult to identify a "specific purpose" for which the project site was acquired or held that would clearly bring it within the protection of art. 97.[16] See *id.* at 509.

Because the spirit of art. 97 is derived from the related doctrine of "prior public use," cases applying that doctrine inform our analysis. See Rep. A.G., Pub. Doc. No. 12, at 146 (prior public use doctrine "background against which [art. 97] was approved"). See also Rep. A.G., Pub. Doc. No. 14, 131 (1980) ("language of Article 97 must be read in conjunction with the judicially developed doctrine of 'prior public use' "). The prior public use doctrine holds that "public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion." *Robbins* v. *Department of Pub. Works*, 355 Mass. 328, 330 (1969). See *Brookline* v. *Metropolitan Dist. Comm'n*, 357 Mass.

---

[16]We do not conclude that land taken pursuant to an urban renewal plan is automatically immune from art. 97. See note 19, *infra*.

435, 440 (1970), and cases cited. However, that doctrine is only applicable "to those lands which are in fact *'devoted to one public use'* " (emphasis added). *Muir* v. *Leominster*, 2 Mass. App. Ct. 587, 591 (1974), quoting *Robbins* v. *Department of Pub. Works, supra*. In the *Muir* case, the Appeals Court held the prior public use doctrine inapplicable to the sale for commercial purposes of a parcel of land, where that parcel had been conveyed to a city as a gift with no limitation on its use but was in fact used for thirty years as a playground and for other recreational purposes. *Muir* v. *Leominster, supra* at 588-589, 591 ("[I]n this case there had been neither prior legislative authorization of a taking for a particular purpose nor a prior public or private grant restricted to a particular purpose").

Here, as the motion judge highlighted, the 1964 urban renewal plan enumerates, among its listed planning and design objectives, certain objectives that are consistent with art. 97 purposes. The 1964 urban renewal plan also contains vague descriptions of the project site and Long Wharf generally that are consistent with its current use as an open space.[17] Most significantly, § 202 of the 1964 urban renewal plan, entitled "Planning Objectives," states as one of its fifteen objectives, the objective "[t]o provide public ways, parks and plazas which encourage the pedestrian to enjoy the harbor and its activities." In addition, in § 203, entitled "General Design Principles," the plan lists several design principles, including:

"3. To provide maximum opportunity for pedestrian access to the water's edge.

"4. To establish an orderly sequence and hierarchy of open spaces and views for both the pedestrian and the motorist.

"5. To establish a relationship between buildings, open

---

[17]Section 204(1)(f) of the 1964 urban renewal plan, under the heading "Sub-Area Design Objectives," identifies a "developmental characteristic[]" of the plan as: "The preservation or redevelopment of wharves which retain the historic tradition of fingers out into the harbor and create active and intimate water inlets. Long Wharf is to retain its historic position as the farthest projection of land into the harbor, and will become an observation platform."

spaces and public ways which provides maximum protection to the pedestrian during unfavorable weather conditions."

By definition, G. L. c. 121B vests in the BRA the authority to take or acquire "decadent, substandard or blighted *open area[s]*" for the purpose of eliminating those undesirable conditions (emphasis added). See G. L. c. 121B §§ 11, 45, 47. However, it does not follow that, where a comprehensive urban renewal plan calls for some areas of a taking to be left open — without a more specific and particularized invocation of art. 97 purposes unique to those areas that effectively designates those areas as separate and apart from the rest of the taking — a two-thirds vote of the Legislature is required for any subsequent change in use or disposition of those open areas. Nor do we find sufficient to invoke art. 97 protection the fact that a comprehensive urban renewal plan may identify, among other objectives, some objectives that are consistent with art. 97 purposes, or where certain areas taken pursuant to that plan ultimately display some attributes of art. 97 land. A contrary rule would be particularly nonsensical where the proposed change in use or disposition that would purportedly trigger the two-thirds vote is made in furtherance of the goals of the particular urban renewal plan and is otherwise appropriate.

Given the overarching purpose of the 1964 urban renewal plan to eliminate urban blight through the comprehensive redevelopment of the waterfront area, including its revitalization through the development of mixed uses and amenities, it cannot be said that the retention of certain open spaces, like the project site, is sufficiently indicative of an art. 97 purpose as to trigger a two-thirds vote of the Legislature should the BRA wish to slightly revise the use of certain spaces in a manner consistent with the objectives of the original urban renewal plan.[18] The fact that the 1964 Urban Renewal Plan (which covered a large

---

[18]Section 1101 of the 1964 urban renewal plan provides for modification of the plan, stating:

"The Urban Renewal Plan may be modified at any time by the Boston Redevelopment Authority provided that, if the general requirements, controls, or restrictions applicable to any part of the Project Area shall be modified after the lease or sale of such part, the modification is

section of downtown Boston) provided in general terms for open spaces and pedestrian access to the water's edge is itself insufficient to invoke art. 97 protections for parts of the original taking that ultimately serve those general purposes. The single, fleeting reference in the 1964 urban renewal plan to an "observation platform" on Long Wharf similarly fails to adequately invoke the specific purposes of art. 97.

Nevertheless, we disagree with the BRA's contention that it cannot possibly take land for art. 97 purposes pursuant to its urban renewal powers under G. L. c. 121B. The purposes served by urban renewal and by art. 97 are not mutually exclusive. Certainly, for the BRA to take land by eminent domain, it must exist in a "decadent, substandard, or blighted" condition. However, where an urban renewal plan accompanying a taking clearly demonstrates a specific intent to reserve particular, well-defined areas of that taking for art. 97 purposes, the BRA conceivably may take land for such purposes while remaining within its statutory authority.[19] The recording of a restriction on the use of land subsequent to a taking may also place land within the

consented to by the Developer or Developers of such part or their successors and assigns. Where proposed modifications will substantially or materially alter or change the Plan, the modifications must be approved by the Boston City Council and the State Division of Urban and Industrial Renewal."

Although a modification clause certainly cannot serve as a unilateral bar to the application of art. 97, the provision for modification demonstrates the often fluid purposes for which land is taken pursuant to an urban renewal plan.

[19]We note, for example, that relying on the Quinn Opinion, the office of the Attorney General concluded in a December 16, 1997, letter to the BRA director that City Hall Plaza in Boston was subject to art. 97 and a two-thirds vote of the Legislature was required to approve the construction of a hotel and parking garage on the site. The Attorney General's letter relied primarily on the language of the Government Center urban renewal plan, which specifically stated that the site of City Hall Plaza "shall be devoted to public open space," as well as the BRA's description of the Plaza at the unveiling of the plan in 1963:

"The strong focal point of the Government Center will be the new City Hall and the Government Center Plaza. Comparable as a *monumental public space* to the most famous squares in Europe . . . (the) City Hall and the new plaza together will be *comparable in function and relationship to the town meeting house and common* in an old-time New England village" (emphasis in original).

protections of art. 97. See *Selectmen of Hanson* v. *Lindsay*, 444 Mass. 502, 504-506 (2005). Furthermore, we disagree with the BRA that the language of an order of taking is necessarily determinative of the applicability of art 97. Under certain circumstances not present here, the ultimate use to which the land is put may provide the best evidence of the purposes of the taking, notwithstanding the language of the original order of taking or accompanying urban renewal plan. See Quinn Opinion, *supra* at 142-143.

b. *Occurrence of triggering condition.* Even if art. 97 did apply to the project site, the issue would remain whether the department's issuance of the chapter 91 license constituted a disposition or change in use of the land triggering the two-thirds vote requirement. Although not necessary to our holding, we briefly address the issue.

The answer to this question depends on whether the chapter 91 license is in fact a mere license, or if it is more properly characterized as an easement. Although the granting of an easement over art. 97 land constitutes a disposition triggering the two-thirds vote requirement, a disposition of any lesser property interest does not. See *Opinions of the Justices*, 383 Mass. 895, 919 (1981) (relinquishment by Commonwealth of any vestigial property interests in tidelands other than "lands and easements" would not trigger art. 97 voting requirement); *Miller* v. *Commissioner of the Dep't of Envtl. Mgt.*, 23 Mass. App. Ct. 968, 969-970 (1987) (department's issuance of revocable one-year permit to operate ski area did not trigger two-thirds vote under art. 97).

General Laws c. 91, § 15, states that "the grant of a license" under that chapter "shall not convey a property right."[20] The

---

[20]In support of their argument that the chapter 91 license confers a property right on the BRA, the plaintiffs point out that the license is not revocable at will but only for noncompliance, lasts thirty years, runs with the land, and must be recorded to be valid. In addition, any revocation of the chapter 91 license is considered a taking that requires just compensation for "valuable structures, fillings, enclosures, uses or other improvements built, made or continued in compliance with said authorization or license." G. L. c. 91, § 15.

Furthermore, G. L. c. 91, § 15, provides:

"A license issued pursuant to this chapter is hereby made a mortgageable interest lawful for investment by any banking association,

BRA owns the project site, and accordingly, the BRA's right to lease the Long Wharf Pavilion to a restaurant operator derives not from the chapter 91 license, but from the fact that the BRA owns the land. The chapter 91 license merely certifies that the planned use, including the lease, complies with G. L. c. 91 and accompanying department regulations. It does not, as the motion judge concluded, *transfer* from the department to the BRA "an extent of legal control over the land at issue."[21] Any disposition triggering the art. 97 voting requirement would need to be granted *by* the BRA — as would be the case with the lease to the restaurant operator — not *to* the BRA.

The chapter 91 license itself is "granted upon the express condition that any and all other applicable authorizations . . . shall be secured by the Licensee *prior* to the commencement of any activity or use authorized pursuant to this License" (emphasis in original). The license also states that it is "granted subject to all applicable Federal, State, County, and Municipal laws, ordinances and regulations." Even if, arguendo, the chapter 91 license created a property right, the right it created is a contingent

trust company, savings bank, cooperative bank, investment company, insurance company, executor, trustee, or other fiduciary, and any other person who is now or may hereafter be authorized to invest in any mortgage or other obligation of a similar nature."

We conclude that, while the aforementioned characteristics of the chapter 91 license acknowledge the economic value of the license, they do not make the license "tantamount to an easement," because the department has no property interest in the project site over which to grant an easement.

[21] In concluding that the department's issuance of the chapter 91 license constituted a disposition of the land, the motion judge relied on language from the Quinn Opinion, *supra* at 144, stating that "all means of transfers or change of legal or physical control are thereby covered, without limitation." First, the notion that any change of legal or physical control no matter how small constitutes a disposition for art. 97 purposes conflicts with our opinion in *Opinions of the Justices*, 383 Mass. 895, 918 (1981), issued after the Quinn Opinion, and with the Appeals Court's holding in *Miller* v. *Commissioner of the Dep't of Envtl. Mgt.*, 23 Mass. App. Ct. 968, 969-970 (1987). Second, and perhaps more important, in issuing the chapter 91 license, the department has not *transferred* legal control over the project site. As the agency charged with enforcing G. L. c. 91, the department has no affirmative legal control over the project site; it is merely vested with the authority to ensure that uses that implicate G. L. c. 91 conform with its requirements and the accompanying regulations.

future interest and would not trigger the voting requirement until the interest vests on obtaining all necessary approvals.

Nor does the issuance of the chapter 91 license constitute a "use[] for other purposes" that would trigger the legislative vote. For lands to which art. 97 does apply, art. 97 legislative approval is likely just one of the many approvals a project proponent will need to acquire in order to proceed with the project. These approvals are issued by various State and local regulatory agencies and are largely independent of one another, yet all are necessary to proceed with the project. It would make little practical sense to condition the application for one such approval, in this case the chapter 91 license, on the successful application for another approval. The chapter 91 license *facilitates* the change in use in the same way the zoning variances and other necessary approvals do. A project proponent like the BRA could conceivably obtain the necessary approvals to change the use of land and, for myriad reasons, never follow through on the planned use. Article 97 requires a two-thirds vote of the Legislature prior to an actual change in use, not mere preparations for that change.

3. *Conclusion.* For the reasons discussed, we conclude that art. 97 does not apply to the project site and, therefore, a two-thirds vote of the Legislature is not required to approve the planned redevelopment. Because the motion judge did not review the issuance of the chapter 91 license pursuant to G. L. c. 30A, § 14, we remand the case to the Superior Court for proceedings consistent with this opinion.[22]

*So ordered.*

---

[22]We note, however, that with art. 97 inapplicable and relief in the form of mandamus therefore inappropriate, we have serious doubts whether the plaintiffs can demonstrate standing to otherwise challenge the chapter 91 license. The department's hearing officer concluded that the plaintiffs did not have standing because they failed to demonstrate that the issuance of the license may cause them to "suffer an injury in fact, which is different either in kind or magnitude from that suffered by the general public which is within the scope of the public interest protected by [G. L. c. 91]." See 310 Code Mass. Regs. § 9.02 (2008). In her final decision, the commissioner declined to adopt the hearing officer's finding of a lack of standing because of her conclusion that the plaintiffs' challenge failed on the merits.