NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12243

 VIRGINIA B. SMITH & others[1]  vs.  CITY OF WESTFIELD & others.[2]


        Hampden.      April 6, 2017. - October 2, 2017.

 Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.[3]


Municipal Corporations, Parks, Use of municipal property.  Parks
     and Parkways.  Constitutional Law, Taking of property.  Due
     Process of Law, Taking of property.



     Civil action commenced in the Superior Court Department on
April 27, 2012.

     The case was heard by Daniel A. Ford, J.

     After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


     Thomas A. Kenefick, III (Mary Patryn also present) for the
plaintiffs.
     Seth Schofield, Assistant Attorney General, for the
Commonwealth, amicus curiae.
     Anthony I. Wilson (John T. Liebel also present) for city of
Westfield.

_____

     [1] Twenty four individuals residing in Westfield and Holyoke.

     [2] The city council of Westfield and the mayor of Westfield.

     [3] Justice Hines participated in the deliberation on this
case prior to her retirement.

The following submitted briefs for amici curiae:
Luke H. Legere & Gregor I. McGregor for Massachusetts Association of Conservation Commissions, Inc.
Edward J. DeWitt for Association to Preserve Cape Cod, Inc.
Sanjoy Mahajan, pro se.
Phelps T. Turner for Conservation Law Foundation.
Jeffrey R. Porter & Colin G. Van Dyke for Trustees of Reservations & others.

GANTS, C.J.  Article 97 of the Amendments to the Massachusetts Constitution, approved by the Legislature and ratified by the voters in 1972, provides that "[l]ands and easements taken or acquired" for conservation purposes "shall not be used for other purposes or otherwise disposed of" without the approval of a two-thirds roll call vote of each branch of the Legislature.  The issue on appeal is whether a proposed change in use of municipal parkland may be governed by art. 97 where the land was not taken by eminent domain and where there is no restriction recorded in the registry of deeds that limits its use to conservation or recreational purposes.  We conclude that there are circumstances where municipal parkland may be protected by art. 97 without any such recorded restriction, provided the land has been dedicated as a public park.  A city or town dedicates land as a public park where there is a clear and unequivocal intent to dedicate the land permanently as a public park and where the public accepts such use by actually using the land as a public park.  Because the municipal land at

issue in this case has been dedicated as a public park, we conclude that it is protected by art. 97.[4]

Background.  The subject of this appeal is a parcel of property owned by the city of Westfield (city), known as the John A. Sullivan Memorial Playground or Cross Street Playground (the parcel or Cross Street Playground), on which the city seeks to build an elementary school. The parcel contains 5.3 acres of land and includes two little league baseball fields and a playground.  Because the parcel's history is at the center of the parties' dispute in this case, we recount it in some detail.

The parcel has served as a public playground for more than sixty years.  The city obtained title to the parcel in 1939 through an action to foreclose a tax lien for nonpayment of taxes.  In 1946, the city planning board recommended that the land be used for a "new playground," and referred the matter to the mayor.  The city council voted in 1948 to turn over "full charge and control" of the property to the playground commission, and in 1949 to transfer funds to the commission to cover costs of "work to be done on Cross [Street] Playground." In November, 1957, the city council passed an ordinance formally

---

[4] We acknowledge the amicus briefs submitted by the Attorney General on behalf of the Commonwealth; the Association to Preserve Cape Cod, Inc.; the Massachusetts Association of Conservation Commissions, Inc.; Sanjoy Mahajan; the Conservation Law Foundation; and the Trustees of the Reservation, Massachusetts Audubon Society and Massachusetts Land Trust Coalition.

naming the playground the "John A. Sullivan Memorial Playground."[5] The mayor approved the ordinance early in 1958. Despite the name formally given, the parcel eventually came to be commonly known as the "Cross Street Playground."

In 1979, working in cooperation with the State government, the city applied for and received a grant from the Federal government (as well as matching funds from the State) to rehabilitate several of its playgrounds, including the Cross Street Playground. The Federal conservation funds that the city received were made available by the Land and Water Conservation Fund Act of 1965 (act). See P.L. 88-578, 78 Stat. 900 (1964), codified as 16 U.S.C. § 460l-8 (1976).[6] The purpose of the act is to assure "outdoor recreation resources" for "all American people of present and future generations" by enabling "all levels of government and private interests to take prompt and coordinated action to the extent practicable without diminishing or affecting their respective powers and functions to conserve, develop, and utilize such resources for the benefit and

---

[5] The ordinance declared that the "parcel of land heretofore designated as a public playground, beginning at a point in the Westerly line of Cross Street," would be "hereafter known as the JOHN A. SULLIVAN MEMORIAL PLAYGROUND."

[6] The relevant provision of the Land and Water Conservation Fund Act of 1965 is presently codified at 54 U.S.C. § 200305 (2012 & Supp. II). However, in this opinion we refer to the provision in effect at the time of the grant application in question, 16 U.S.C. § 460l-8 (1976).

enjoyment of the American people."  16 U.S.C. § 460l (1976).

Grant money distributed pursuant to the act is known as LWCF

funding.

The act imposed several key requirements on States seeking

LWCF funding in support of local park projects.  First, it

required States to develop a "comprehensive statewide outdoor

recreation plan" (SCORP) setting forth, among other information,

the State's evaluation of its need for outdoor recreation

resources and designating the State agency that would represent

the State in the LWCF funding process.  Id. at § 460l-8(d).[7]  The

act also mandated that "[n]o property acquired or developed with

assistance under this section shall . . . be converted to other

than public outdoor recreation uses" without the approval of the

United States Secretary of the Interior (Secretary).  Id. at

§ 460l-8(f)(3).  Further, the act stated that "the Secretary

shall approve such conversion only if he finds it to be in

accord with the then existing comprehensive statewide outdoor

recreation plan and only upon such conditions as he deems

necessary to assure the substitution of other recreation

properties of at least equal fair market value and of reasonably

---

[7] In Massachusetts, the Land and Water Conservation Fund
program is administered through the Executive Office of Energy
and Environmental Affairs.  See Massachusetts Statewide
Comprehensive Outdoor Recreation Plan, Executive Office of
Energy and Energy and Environmental Affairs 1 (2012),
http://www.mass.gov/eea/docs/eea/dcs/scorp-2012-final.pdf
[https://perma.cc/F4D6-W4MS]

equivalent usefulness and location." Id. The grant agreement for rehabilitation of the Cross Street Playground indicates that the grant was expressly conditioned on compliance with the act. Therefore, by accepting the Federal monies under the act, the city forfeited the ability to convert any part of the Cross Street Playground to a use other than public outdoor recreation unilaterally; such a conversion could only proceed with the approval of the Secretary.  The 2006 Massachusetts SCORP states explicitly that "[l]and acquired or developed with [LWCF] funds become[s] protected under the Massachusetts Constitution (Article 97) and [F]ederal regulations -- and cannot be converted from intended use without permission" from the National Park Service and Executive Office of Energy and Environmental Affairs.  See Massachusetts Outdoors 2006: Statewide Comprehensive Outdoor Recreation Plan, Executive Office of Energy and Environmental Affairs 4, http://www.mass.gov/eea/docs/eea/dcs/massoutdoor2006.pdf [https://perma.cc/T3D7-4EKN].  See also Massachusetts Statewide Comprehensive Outdoor Recreation Plan, Executive Office of Energy and Energy and Environmental Affairs 2 (2012), http://www.mass.gov/eea/docs/eea/dcs/scorp-2012-final.pdf [https://perma.cc/F4D6-W4MS] (describing land funded by LWCF as protected under art. 97).[8]  The restrictions imposed by the act

_____

[8] The record does not reflect how the Massachusetts

on the management of land acquired or developed with LWCF funding remain in full effect over the Cross Street Playground. See 54 U.S.C. § 200305(f)(3) (2012 & Supp. II).

In 2009, a report on a survey of the city's parks and open space conducted by the Department of Conservation and Recreation, the Pioneer Valley planning commission, and the Franklin Regional council of governments included a map that identifies the Cross Street Playground as "permanently protected open space."  A year later, the city's mayor endorsed an open space plan which noted that, although not all public land is "permanently committed for conservation purposes," Cross Street Playground was public land with a "full" degree of protection and "active" recreation potential.

On August 18, 2011, the city council voted to transfer the entire Cross Street Playground from the city's parks and recreation department to its school department for the purpose of constructing a new elementary school on the land.  In 2012, the city began a demolition process that included taking down century-old trees and removing a portion of the playground.

The plaintiffs, a group of city residents, commenced this action in April, 2012, naming the city and city council as defendants, as well as the mayor and city councillors in their

---

comprehensive Statewide outdoor recreation plan (SCORP) in effect at the time of the 1979 grant application characterized the status of the Cross Street Playground.

official capacities.  The plaintiffs sought a restraining order to halt the construction project under G. L. c. 214, § 7A, and G. L. c. 40, § 53.[9]  In addition, the plaintiffs sought relief in the nature of mandamus under G. L. c. 249, § 5, requesting that the court order the defendants to comply with art. 97 of the Massachusetts Constitution prior to any construction or operation of a new school on any part of the Cross Street Playground.

A Superior Court judge issued a temporary restraining order to halt construction of the school on the Cross Street Playground in September, 2012, and later granted the plaintiffs' motion for a preliminary injunction.  In issuing the injunction, the judge agreed with the defendants that "the failure to build a new public school would have an adverse impact on the residents of the city, specifically the children, who are currently learning in outdated and decaying schools."  But the judge made clear that she was "not prohibiting the construction of a new school"; she was "merely ordering the [c]ity to comply with the law before it proceeds."

---

[9] Under G. L. c. 214, § 7A, the Superior Court may determine whether damage to the environment is about to occur and restrain the person who is about to cause it, provided that the damage about to be caused constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment.  "General Laws c. 40, § 53, provides a mechanism for taxpayers to enforce laws relating to the expenditure of tax money by a local government." See LeClair v. Norwell, 430 Mass. 328, 332 (1999).

The parties later submitted cross motions for the entry of judgment based on an agreed statement of facts, essentially asking the court to decide whether the preliminary injunction should be made permanent or vacated.  By this stage of the litigation, the parties had stipulated that the only question for decision was whether the Cross Street Playground was protected by art. 97.  Another Superior Court judge concluded that the Supreme Judicial Court in Mahajan v. Department of Envtl. Protection, 464 Mass. 604, 615 (2013), "decided that a parcel of land acquires Article 97 protection only when the land is specifically designated for Article 97 purposes by a recorded instrument."  Because there was no recorded instrument designating that the Cross Street Playground was to be used as a playground or for any other recreational purpose, the judge concluded that the parcel was not protected by art. 97.  Consequently, he vacated the preliminary injunction and ordered judgment to enter for the defendants.

The plaintiffs appealed, and the Appeals Court affirmed the judgment.  Smith v. Westfield, 90 Mass. App. Ct. 80, 81 (2016).  The Appeals Court agreed with the motion judge that land is protected by art. 97 only where it was taken or acquired for conservation or another purpose set forth in art. 97, or where "the land is specifically designated for art. 97 purposes by deed or other recorded restriction."  Id. at 82.  Justice

Milkey, in a concurrence, agreed that the Supreme Judicial Court opinions in Selectmen of Hanson v. Lindsay, 444 Mass. 502, 506-509 (2005), and Mahajan, 464 Mass. at 615-616, "appear to say" that, where land was taken or acquired for non-art. 97 purposes, it will only be subject to art. 97 "where the restricted use has been recorded on the deed, e.g., through a conservation restriction." Smith, 90 Mass. App. Ct. at 86. But Justice Milkey invited this court to "revisit such precedent," id. at 84, declaring, "Nothing in the language or purpose of art. 97 suggests that its application should turn on whether the underlying deed provides record notice that the land has been committed to an art. 97 use." Id. at 87. He concluded, "The overriding point of art. 97 is to insulate dedicated parkland from short-term political pressures. I fear that the effect of Hanson and Mahajan is to rob art. 97 of its intended force with regard to a great deal of dedicated parkland across the Commonwealth." Id. at 88. We allowed the plaintiff's application for further appellate review.

Discussion. Article 97 provides, among other things, that "[t]he people shall have the right to clean air and water . . . and the natural, scenic, historic, and esthetic qualities of their environment." It declares a "public purpose" in "the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral,

forest, water, air and other natural resources." Id.  It grants the Legislature the power "to provide for the taking, upon payment of just compensation therefor, or for the acquisition by purchase or otherwise, of lands and easements or such other interests therein as may be deemed necessary to accomplish these purposes." Id.  And, most importantly for purposes of this appeal, it provides:  "Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court." Id.[10]

_____

[10] The full text of art. 97 of the Amendments to the Massachusetts Constitution annuls art. 49 of the Amendments to the Massachusetts Constitution and then provides:

"The people shall have the right to clean air and water; freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.

"The general court shall have the power to enact legislation necessary or expedient to protect such rights.

"In the furtherance of the foregoing powers, the general court shall have the power to provide for the taking, upon payment of just compensation therefor, or for the acquisition by purchase or otherwise, of lands and easements or such other interests therein as may be deemed necessary to accomplish these purposes.

"Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote,

The issue on appeal requires us to interpret the meaning of art. 97 to determine whether the Cross Street Playground is protected land under art. 97 that may be used for another purpose -- here, the purpose of building a public school -- only by obtaining the approval by a two-thirds vote of each branch of the Legislature.  We do not interpret art. 97 on a clean slate. We have recognized that the language of art. 97 is "relatively imprecise" and that its provisions must be interpreted "in light of the practical consequences that would result from . . . an expansive application, as well as the ability of a narrower interpretation to serve adequately the stated goals of art. 97." Mahajan, 464 Mass. at 614-615.  We also have recognized that land may be protected by art. 97 where it was neither taken by eminent domain nor acquired for any of the purposes set forth in art. 97 provided that, after the taking or acquisition, it "was designated for those purposes in a manner sufficient to invoke the protection of art. 97."  See id. at 615.  Therefore, to resolve the issue in this case, we must first determine what it means to "designate" land for an art. 97 purpose in a manner

taken by yeas and nays, of each branch of the general court."

sufficient to invoke art. 97 protection, and then determine whether the Cross Street Playground was so designated.[11]

We do not agree with the motion judge and the Appeals Court that we have already concluded in our opinions in Selectmen of Hanson and Mahajan that the only way to designate land for art. 97 purposes is through a deed or recorded conservation restriction, although we acknowledge that there is language in those opinions that invites this inference.[12]

In Mahajan, 464 Mass. at 608, 612, 615 n.15, the issue on appeal was whether a plaza area surrounding an open-air pavilion at the eastern end of Long Wharf in Boston that was identified as a park "was 'taken' for art. 97 purposes." The parcel was a small part of the land taken by eminent domain in 1970 by the Boston Redevelopment Authority (BRA) as part of the 1964 Downtown Waterfront-Faneuil Hall urban renewal plan. Id. at

---

[11] The city did not challenge the plaintiffs' assertion below that the use of Cross Street Playground fell within the range of environmental purposes contemplated by art. 97.

[12] We note that these prior decisions refer to two different procedures by which a city might designate a property as parkland. First, we said a city might record a conservation restriction pursuant to G. L. c. 184, § 31. See Selectmen of Hanson v. Lindsay, 444 Mass. 502, 506-507 (2005). Second, we suggested that a city might "deed the land to itself for conservation purposes." See Mahajan v. Department of Envtl. Protection, 464 Mass 604, 616 (2013). This distinction is not relevant to this case, where it is undisputed that there is no recorded restriction on the use of the Cross Street Playground. For the sake of simplicity, we shall characterize both procedures as "recorded deed restrictions" on the use of property when referring to these decisions.

606-607. We recognized that one of the fifteen "planning objectives" under that plan was "[t]o provide public ways, parks and plazas which encourage the pedestrian to enjoy the harbor and its activities," id. at 608 n.7, but we determined that the "overarching purpose" for which the land was taken was to eliminate "decadent, substandard or blighted open conditions." Id. at 612, quoting G. L. c. 121B, § 45. We declared that land is not taken for art. 97 purposes simply because it "incidentally" promotes conservation, or because it "simply displays some attributes of art. 97 land generally," or because "a comprehensive urban renewal plan may identify, among other objectives, some objectives that are consistent with art. 97 purposes." Id. at 613-614, 618. We concluded that, "[g]iven the overarching purpose of the 1964 urban renewal plan to eliminate urban blight through the comprehensive redevelopment of the waterfront area, including its revitalization through the development of mixed uses and amenities, it cannot be said that the retention of certain open spaces, like the project site, is sufficiently indicative of an art. 97 purpose as to trigger a two-thirds vote of the Legislature should the BRA wish to slightly revise the use of certain spaces in a manner consistent with the objectives of the original urban renewal plan." Id. at 618.

Nevertheless, we recognized that land taken by eminent domain specifically for art. 97 purposes could fall under the provision's protections "where an urban renewal plan accompanying a taking clearly demonstrates a specific intent to reserve particular, well-defined areas of that taking for art. 97 purposes." Id. at 619. And we recognized that, "[u]nder certain circumstances not present here, the ultimate use to which the land is put may provide the best evidence of the purposes of the taking, notwithstanding the language of the original order of taking or accompanying urban renewal plan." Id. at 620.

In Selectmen of Hanson, 444 Mass. at 504-505, the issue was not whether a parcel of land had been taken for art. 97 purposes (it was not), but whether a town meeting vote was sufficient by itself to transform a town's general corporate property into conservation land protected by art. 97. The town had acquired the property through a tax taking in 1957 and held it as general corporate property that could be disposed of in any manner authorized by law. Id. at 504. In 1971, the town at its annual meeting voted "to accept for conservation purposes, a deed, or deeds to" the parcel, but the property was never actually placed under the custody and control of the conservation commission. Id. at 504, 506. Rather, the property remained under the control of the board of selectmen, which was authorized to

execute a deed imposing a conservation restriction on the property but never did.[13]  Id. at 506, 508.  In 1998, the town sold the property at a public auction to the defendant, but in 2002 commenced an action seeking a declaration that the sale was invalid and void because the land was subject to art. 97 and the sale had not been approved by a two-thirds vote of each branch of the Legislature.  Id. at 503.  We rejected the town's claim, reasoning that the 1971 vote "merely expressed the town's interest in dedicating the locus to conservation purposes," and that subsequently the town took "no further action" to achieve that goal.  Id. at 508.  In these circumstances we declared that "an instrument creating such a property restriction had to be filed with the registry of deeds in order for the town's interest to prevail over that of any subsequent bona fide purchaser for value."  Id. at 505.

In the circumstances presented in Selectmen of Hanson, where the town intended to designate land for conservation purposes by executing a deed with a conservation restriction but

---

[13] "'A conservation restriction means a right, either in perpetuity or for a specified number of years, whether or not stated in the form of a restriction, easement, covenant or condition, in any deed, will or other instrument executed by or on behalf of the owner of the land or in any order of taking, appropriate to retaining land or water areas predominantly in their natural, scenic or open condition or in agricultural, farming or forest use . . .' (emphasis added)."  Selectmen of Hanson v. Lindsay, 444 Mass. 502, 507 (2005), quoting G. L. c. 184, § 31.

never did, it is true, as we said in Mahajan, 464 Mass. at 616, that "the town had to deed the land to itself for conservation purposes -- or record an equivalent restriction on the deed -- in order for art. 97 to apply to subsequent dispositions or use for other purposes."  But this should not be understood to mean that, in all circumstances, the only way that land not taken or acquired for an art. 97 purpose may become protected by art. 97 is through a recorded deed restriction.  To understand the other ways that land may be "designated" for conservation purposes "in a manner sufficient to invoke the protection of art. 97," see Mahajan, 464 Mass. at 615, we need to examine two related common law doctrines:  the dedication of land for public use and prior public use.  See id. at 616 ("the spirit of art. 97 is derived from the related doctrine of 'prior public use'").

Under our common law, where developers on private land built roads that were dedicated to the use of the public, the land on which those roads were built became "subject to the easement of a public way" where "the intent to dedicate [is] made manifest by the unequivocal declarations or acts of the owner" and where the dedication is accepted by the public.  Hayden v. Stone, 112 Mass. 346, 349 (1873).  "No specific length of time is necessary; the acts of the parties to the dedication when once established complete it."  Id.  See Longley v. Worcester, 304 Mass. 580, 588 (1939) ("The owner's acts and

declarations should be deliberate, unequivocal and decisive, manifesting a clear intention permanently to abandon his property to the specific public use").  Similarly, where a developer in Wareham bought a large tract of land to sell building lots for residences, and private businesses, and reserved open space for "parks, squares, groves and shore fronts," the open space was subject to an easement for public use upon proof that the owner "had dedicated the use of these lands to the public" and that the public had accepted the dedication through use of the open space.  Attorney Gen. v. Onset Bay Grove Ass'n, 221 Mass. 342, 347-348 (1915) (Onset Bay Grove Ass'n).  See Attorney Gen. v. Abbott, 154 Mass. 323, 326-329 (1891).  The dedication "may spring from oral declarations or statements by the dedicator, or by those authorized to act in his behalf, made to persons with whom he deals and who rely upon them; or it may consist of declarations addressed directly to the public."  Onset Bay Grove Ass'n, 221 Mass. at 348.  "It also may be manifested by the owner's acts from which such an intention can be inferred."  Id.

A city or town that owns land in its proprietary capacity and uses the land for a park may also dedicate the parkland to the use of the public.  "A municipality may dedicate land owned by it to a particular public purpose provided there is nothing in the terms and conditions by which it was acquired or the

purposes for which it is held preventing it from doing so, . . . and upon completion of the dedication it becomes irrevocable" (citation omitted). Lowell v. Boston, 322 Mass. 709, 730 (1948). "The general public for whose benefit a use in the land was established by an owner obtains an interest in the land in the nature of an easement." Id. This court applied the public dedication doctrine in holding that, even though title to the Boston Common and the Public Garden "vested in fee simple in the town free from any trust," the city did not possess title to this parkland "free from any restriction, for it is plain that the town has dedicated the Common and the Public Garden to the use of the public as a public park." Id. at 729-730. "The title to the Common and the Public Garden is in the city; the beneficial use is in the public." Id. at 735.

The "general public" that has obtained an "interest in the land in the nature of an easement," id. at 730, is not simply the residents of the particular city or town that owns the parkland. See Higginson v. Treasurer and Sch. House Comm'rs of Boston, 212 Mass. 583, 589 (1912). This court in Higginson declared:

> "[T]he dominant aim in the establishment of public parks appears to be the common good of mankind rather than the special gain or private benefit of a particular city or town. The healthful and civilizing influence of parks in and near congested areas of population is of more than local interest and becomes a concern of the State under modern conditions. It relates not only to public health in

its narrow sense, but to broader considerations of
exercise, refreshment and enjoyment."

Id. at 590.

Because the general public has an interest in parkland owned by a city or town, ultimate authority over a public park rests with the Legislature, not with the municipality. See Lowell, 322 Mass. at 730. "The rights of the public in such an easement are subject to the paramount authority of the General Court which may limit, suspend or terminate the easement." Id. As stated in Lowell, 322 Mass. at 730, quoting Wright v. Walcott, 238 Mass. 432, 435 (1921):

> "Land acquired by a city or town by eminent domain or through expenditure of public funds, held strictly for public uses as a park and not subject to the terms of any gift, devise, grant, bequest or other trust or condition, is under the control of the General Court . . . The power of the General Court in this regard is supreme over that of the city or town."

Because the Legislature has "paramount authority" over public parks, dedicated parkland cannot be sold or devoted to another public use without the approval of the Legislature. "The rule that public lands devoted to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation authorizing the diversion is now firmly established in our law." Robbins v. Department of Pub. Works, 355 Mass. 328, 330 (1969). See Higginson, 212 Mass. at 591 ("Land appropriated to one public use cannot be diverted to another inconsistent public use without plain and explicit

legislation to that end").  This "rule," known as the doctrine of "prior public use," Mahajan, 464 Mass. at 616, is not limited to parkland.  See, e.g., Boston & Albany R.R. v. City Council of Cambridge, 166 Mass. 224, 225 (1896); Old Colony R.R. v. Framingham Water Co., 153 Mass. 561, 563 (1891); Boston Water Power Co. v. Boston & W.R. Corp., 23 Pick. 360, 398 (1839).  But it is applied more "stringently" where a public agency or municipality seeks to encroach upon a park.  Robbins, supra at 330 ("In furtherance of the policy of the Commonwealth to keep parklands inviolate the rule has been stringently applied to legislation which would result in encroachment on them"); Gould v. Greylock Reservation Comm'n, 350 Mass. 410, 419 (1966), quoting Higginson, 212 Mass. at 591-592 ("The policy of the Commonwealth has been to add to the common law inviolability of parks express prohibition against encroachment").  Three years before the ratification of art. 97, this court declared in Robbins, supra at 331:

> "We think it is essential to the expression of plain and explicit authority to divert parklands, Great Ponds, reservations and kindred areas to a new and inconsistent public use that the Legislature identify the land and that there appear in the legislation not only a statement of the new use but a statement or recital showing in some way legislative awareness of the existing public use.  In short, the legislation should express not merely the public will for the new use but its willingness to surrender or forgo the existing use."

The meaning of the provision in art. 97 at issue in this case -- "Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court" -- must be understood in this common-law context.  Cf. Industrial Fin. Corp. v. State Tax Comm'n, 367 Mass. 360, 364 (1975), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934) (where meaning of statute is not plain from its language, we look to intent of Legislature "ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated").  The consequence of art. 97's ratification was that "plain and explicit legislation authorizing the diversion" of public parkland under the prior public use doctrine, which previously could be enacted by a bare majority of the Legislature, now required a two-thirds vote of each branch.  See Robbins, supra at 330.  See also Legislative Research Council, Report Relative to the Preservation of the Natural Environment, 1971 House Doc. No. 5301.  In Opinion of the Justices, 383 Mass. 895, 918 (1981), we made clear that art. 97 applied to all property that was taken or acquired for art. 97 purposes, including property

taken or acquired before its ratification in 1972. "To claim that new Article 97 does not give the same care and protection for all these existing public lands as for lands acquired by the foresight of future legislators or the generosity of future citizens would ignore public purposes deemed important in our laws since the beginning of our Commonwealth." Id., quoting Rep. A.G., Pub. Doc. No. 12, at 139, 141 (1973).

There is no reason to believe that art. 97 was intended by the Legislature or the voters to diminish the scope of parkland that had been protected under the common law by the prior public use doctrine or the doctrine of public dedication. Such an interpretation would suggest that voters were hoodwinked into thinking they were expanding the protection of such lands by replacing art. 49 of the Amendments to the Massachusetts Constitution with art. 97 when, in fact, they were actually reducing the protection already afforded these lands under the common law.[14] See Bates v. Director of Office of Campaign &

---

[14] Article 49, which was annulled by art. 97, see note 10, supra, provided:

> "The conservation, development and utilization of the agricultural, mineral, forest, water and other natural resources of the commonwealth are public uses, and the general court shall have power to provide for the taking, upon payment of just compensation therefor, of lands and easements or interests therein, including water and mineral rights, for the purpose of securing and promoting the proper conservation, development, utilization and control

Fin., 436 Mass. 144, 173-174 (2002), quoting Boston Elevated Ry.
v. Commonwealth, 310 Mass. 528, 548 (1942) ("We will not impute
to the voters who enacted the clean elections law an 'intention
to pass an ineffective statute'").  Therefore, we conclude that
parkland protected by art. 97 includes land dedicated by
municipalities as public parks that, under the prior public use
doctrine, cannot be sold or devoted to another public use
without plain and explicit legislative authority.  See Mahajan,
464 Mass. at 615 (art. 97 protects land "designated" for art. 97
purposes "in a manner sufficient to invoke the protection of
art. 97").

Given this conclusion, we turn to the question whether the
Cross Street Playground was dedicated by the city as a public
park such that the transfer of its use from a park to a school
would require legislative approval under the prior public use
doctrine and, thus, under art. 97.  Under our common law, land
is dedicated to the public as a public park when the landowner's
intent to do so is clear and unequivocal, and when the public
accepts such use by actually using the land as a public park.
See Longley, 304 Mass. at 587-588; Onset Bay Grove Ass'n, 221
Mass. at 347-348; Hayden, 112 Mass. at 349.  There are various
ways to manifest a clear and unequivocal intent.  See e.g.,

_____

thereof and to enact legislation necessary or expedient
therefor."

Onset Bay Grove Ass'n, 221 Mass. at 348-349 (dedication found based on Association's plan, sales statements, and repeated declarations that its open spaces "should never be encroached upon"). The recording of a deed or a conservation restriction is one way of manifesting such intent but it is not the only way. For instance, it was "plain" to this court that the Boston Common and Public Garden had been dedicated as a public park without there being any deed or conservation restriction declaring the land to be a public park. See Lowell, 322 Mass. at 729-730.

The clear and unequivocal intent to dedicate public land as a public park must be more than simply an intent to use public land as a park temporarily or until a better use has emerged or ripened. See Longley, 304 Mass. at 588 (requiring "a clear intention permanently to abandon his property to the specific public use"). Rather, the intent must be to use the land permanently as a public park, because the consequence of a dedication is that "[t]he general public for whose benefit a use in the land was established . . . obtains an interest in the land in the nature of an easement," Lowell, 322 Mass. at 730, and "upon completion of the dedication it becomes irrevocable." Id.

The plaza area on Long Wharf in Mahajan, although identified as a park, failed to meet this standard because there

was not proof of a clear and unequivocal intent by the BRA to make the plaza permanently a public park.  The urban renewal plan accompanying the taking did not reflect a specific intent to reserve that land forever as a public park but instead left open the possibility of revising the use of such open space if doing so would better accomplish the objectives of the urban renewal plan.  Mahajan, 464 Mass. at 618-619.  The parcel in Selectmen of Hanson, although accepted for conservation purposes by town meeting, failed to meet this standard both because there was no clear and unequivocal intent to dedicate the land permanently as conservation land where the town never actually transferred control of the land to the conservation commission and never acted to impose any restriction on the land, and where the land was never actually used by the public as conservation land.  Selectmen of Hanson, 444 Mass. at 506-508.

The Cross Street Playground, however, was dedicated as a public park by the city under this standard, and therefore is protected under the prior public use doctrine and art. 97.  We need not determine whether it would have been enough to meet the clear and unequivocal intent standard that the land had been used as a public park for more than sixty years, or that control of the land had been turned over to the playground commission, or that an ordinance was passed naming the parcel.  Although we consider the totality of the circumstances, the determinative

factor here was the acceptance by the city of Federal conservation funds under the act to rehabilitate the playground with the statutory proviso that, by doing so, the city surrendered all ability to convert the playground to a use other than public outdoor recreation without the approval of the Secretary.  See 16 U.S.C. § 460l-8(f)(3).  Regardless of whether the parcel had been dedicated earlier as a public park, it became so dedicated once the city accepted Federal funds pursuant to this condition.  It is significant that this understanding was shared by the Executive Office of Energy and Environmental Affairs, whose 2006 SCORP stated that land developed with LWCF funds became protected under art. 97.

Conclusion.  Because we conclude that the Cross Street Playground is protected by art. 97 of the Amendments to the Massachusetts Constitution, the judgment in favor of the defendants is vacated.  Where the parties have agreed that, if the land is so protected, judgment should enter for the plaintiffs converting the preliminary injunction into a permanent injunction, we remand the case to the Superior Court for the issuance of such a judgment consistent with this opinion.

So ordered.