NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13410

BRIAN CARROLL & another[1] vs.  SELECT BOARD OF NORWELL & others.[2]


Suffolk.     September 11, 2023. - January 5, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Public Land.  Municipal Corporations, Acquisition of real
     estate, Use of municipal property.  Housing.  Practice,
     Civil, Summary judgment, Continuance, Discovery.


Civil action commenced in the Land Court Department on
December 22, 2021.

The case was heard by Kevin T. Smith, J., on motions for
summary judgment.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Brian Carroll, pro se.
Robert W. Galvin (Anthony J. Riley also present) for the
defendants.
Tim Wall, pro se, was present but did not argue.
Joseph N. Schneiderman, for Massachusetts Association of
Realtors, amicus curiae, submitted a brief.

_____

[1] Tim Wall.

[2] Three members of the select board of Norwell.

GEORGES, J.  Under G. L. c. 40, § 15A, if town-owned land is "held . . . for a specific purpose," that land cannot be diverted to another, inconsistent use until it has been determined by the "board or officer having charge of [the] land" that the land is no longer needed for that purpose.  In this case, several residents of the town of Norwell (town) brought a complaint in the Land Court to compel the town's select board (board) to transfer municipal land to the town's conservation commission.  A Land Court judge granted the board's motion for summary judgment, concluding that the municipal land had been designated for a specific purpose -- the development of affordable housing -- and therefore, pursuant to G. L. c. 40, § 15A, the parcels could not be transferred without a determination by the board that the land was no longer needed for this purpose.

The issue on appeal is whether the totality of the circumstances test articulated in Smith v. Westfield, 478 Mass. 49, 63-64 (2017), applies to the determination whether land is "held by a city or town . . . for a specific purpose" under G. L. c. 40, § 15A.  We answer that question affirmatively and conclude that town-owned land is held for a specific municipal purpose under G. L. c. 40, § 15A, where the totality of the circumstances indicates a clear and unequivocal intent by the town to hold the land for such purpose.

Applying the totality of the circumstances test to the summary judgment record presented here, we conclude that there is no material dispute of fact regarding the town's intent to dedicate the municipal land at issue for the purpose of affordable housing.  Accordingly, we further conclude that the allowance of summary judgment for the board was correct.[3]

1.  Background.  a.  Facts.  We recite the material, undisputed facts from the record.  See Arias-Villano v. Chang & Sons Enters., Inc., 481 Mass. 625, 626 (2019).  We reserve further recitation of the facts for our discussion infra.

The subject of this appeal is a two-parcel property on Wildcat Lane in, and owned by, the town (Wildcat land).  The town acquired the land in 1989 through tax foreclosures and thereafter foreclosed all rights of redemption for each parcel. The subject parcels total approximately 6.3 acres.

On May 11, 2004, town meeting unanimously voted to authorize the board to make the Wildcat land "available . . . for affordable housing."  Subsequently, around 2005, the town's master plan committee discussed the idea of granting a private developer permission to construct a roadway over a portion of the Wildcat land in exchange for the developer constructing

---

[3] We acknowledge the amicus brief submitted by the Massachusetts Association of Realtors in support of affirming the Land Court's decision.

affordable housing units on that land.  However, the board was not interested in such an arrangement.

In 2007, to support the development of affordable housing in the town, residents voted at town meeting to adopt an affordable housing trust bylaw, which authorized the creation of a community housing trust (trust).[4]  The trust then hired consultants in 2013 and 2019 to delineate the wetlands located on the Wildcat land and to perform a "site assessment" on it for the purpose of advising the town on what type of affordable housing would be appropriate for the land.

In 2009, a private developer who owned vacant land abutting the Wildcat land obtained a permit to construct a residential subdivision known as Wildcat Hill Open Space Residential Development (Wildcat Hill).  The plaintiffs, Brian Carroll and Tim Wall, are residents of Wildcat Hill.  That same year, the board granted a revocable license to the private developer to construct and maintain an unpaved, rustic path for pedestrians and bicycles across a portion of the Wildcat land close to the boundary line with Wildcat Hill.

---

[4] The 2007 town meeting vote that created the trust did not authorize it to hold or control undeveloped land.  Although the trust was granted expanded authority to hold property in 2012, the board has not transferred the wildcat land to the trust or any other body.

In September 2019, the trust published an update to the town's "Housing Production Plan" that identified the Wildcat land as being "in the planning or predevelopment phases." The same document noted that the Wildcat land was "designated for developing affordable housing" by town meeting. In early 2021, the trust met with the board to discuss the development of affordable housing on the Wildcat land.

Shortly thereafter, Carroll drafted a citizens' petition seeking to authorize and direct the board to transfer the Wildcat land to the conservation commission to be reserved for, among other things, conservation purposes. After amassing the requisite number of signatures, the petition was added to the 2021 town meeting warrant as article 26. Specifically, article 26 called for a vote "to authorize and direct the Board of Selectmen to transfer care, custody, maintenance and control of [the Wildcat land] to the Conservation Commission, to be held for conservation, passive recreation and historic preservation purposes in perpetuity." At the 2021 town meeting, article 26 received the required two-thirds majority vote.

In October 2021, at one of its regular meetings, the board discussed transferring the Wildcat land to the conservation commission as authorized and directed by article 26. Several board members expressed their belief that, before the board could vote on a measure directing town counsel to draft

documents for the transfer of the Wildcat land, the board first was required to determine that the land was no longer needed for affordable housing purposes. The board then held a vote on a motion to declare that the Wildcat land was no longer needed for affordable housing purposes. The vote did not pass; thus, the board did not direct town counsel to draft documents to transfer the land to the conservation commission. Two months later, this suit followed.

b. Procedural history. Carroll, Wall, and eight other residents of the town[5] filed a complaint in the Land Court against the board and three individual members in their representative capacity, seeking equitable relief in the nature of mandamus under G. L. c. 249, § 5. Specifically, the plaintiffs requested an order from the Land Court compelling the board to transfer the Wildcat land to the conservation commission as directed by article 26. Shortly thereafter, the parties filed cross motions for summary judgment.

A Land Court judge granted the board's motion for summary judgment, explaining that the Wildcat land had been designated for a specific purpose within the meaning of G. L. c. 40, § 15A, because it was the intent of the board to designate the land for

_____

[5] Of the ten plaintiffs, only Carroll and Wall appealed from the Land Court judgment. In reference to the appeal, "plaintiffs" refers to Carroll and Wall.

affordable housing, as reflected by the 2004 town meeting vote and the town's subsequent steps to explore the development of affordable housing on the land. Accordingly, the Land Court judge held that the Wildcat land could not be transferred to another public use without the board first determining that the land was no longer needed for affordable housing -- a determination the board had not made.

The plaintiffs appealed, arguing that the land was not set aside for a specific municipal purpose within the meaning of G. L. c. 40, § 15A, because any such restriction must be recorded through an official instrument under this court's decision in Selectmen of Hanson v. Lindsay, 444 Mass. 502 (2005). The board cross-appealed, challenging the plaintiffs' standing to bring a mandamus action under G. L. c. 249, § 5, and arguing that the outcome in this case should be controlled by our decision in Harris v. Wayland, 392 Mass. 237 (1984), which held that undeveloped land, purchased for school purposes, could not be sold to the town housing authority for construction of elderly and low-income housing absent the school committee's determination that the land was no longer needed for school purposes.[6] We transferred this case sua sponte from the Appeals

---

[6] Because we conclude that summary judgment for the board was proper on the merits, we decline to resolve the question of standing. See Trigones v. Attorney Gen., 420 Mass. 859, 860

Court to clarify the standard for assessing specific-use designations within the meaning of G. L. c. 40, § 15A.

2. <u>Discussion</u>. a. <u>Standard of review</u>. "We review a grant of summary judgment de novo." <u>Regis College</u> v. <u>Weston</u>, 462 Mass. 280, 284 (2012). "Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law" (citation omitted). <u>Adams</u> v. <u>Schneider Electric USA</u>, 492 Mass. 271, 280 (2023). "Where both parties have moved for summary judgment, 'the evidence is viewed in the light most favorable to the party against whom judgment' has been entered," in this case, the plaintiffs (citation omitted). <u>Smiley First, LLC</u> v. <u>Department of Transp</u>., 492 Mass. 103, 108 (2023).

b. <u>Statutory framework</u>. Under Massachusetts law, there are several ways a municipality can hold real estate. See <u>Harris</u>, 392 Mass. at 240. General Laws c. 40, § 3, allows municipalities to hold real estate "for the public use of the inhabitants." The property is placed under the charge of a town's select board as part of the town's general corporate inventory. See G. L. c. 40, § 3 ("All real estate . . . of the town, not by law or by vote of the town placed in the charge of

_____

(1995) ("Assuming, without deciding, that the plaintiff has standing to challenge the statute's constitutionality, we address his claim").

any particular board, officer or department, shall be under the control of the selectmen . . ."). Alternatively, a municipality may hold real estate for a specific municipal purpose. Unlike a municipality's general corporate inventory, such property can be placed in the charge of either a particular board or the select board for a specific municipal purpose. See G. L. c. 40, § 15A. If land is held for a specific municipal purpose within the meaning of § 15A, that land cannot be diverted to another use until the "board or officer having charge of [the] land" determines that the land is no longer needed for that purpose. Id. See Harris, 392 Mass. at 240.

Accordingly, if the town "held" the Wildcat land for the "specific purpose" of affordable housing, transferring the Wildcat land to the conversation commission would entail a two-step process: first, the board, which has control of the land, must make a determination that the land is no longer needed for affordable housing, and second, the town by a two-thirds vote must authorize transferring the custody of the land to the conservation commission. See G. L. c. 40, § 15A; Harris, 392 Mass. at 243. Alternatively, if the Wildcat land is not held for a specific purpose, the land could be transferred to the conservation commission without a separate vote by the board to determine that it is no longer needed for affordable housing. See G. L. c. 40, § 3.

c.    Specific purpose designations under G. L. c. 40, § 15A.
Before turning to the question whether the Wildcat land was held
for affordable housing on these facts, we must first discuss the
appropriate legal standard to determine whether land is held for
a specific purpose under § 15A.

The parties disagree as to the proper standard.  The board
asks this court to consider all attendant circumstances in
analyzing whether the town intended to dedicate the Wildcat land
to affordable housing.  The plaintiffs, by contrast, assert that
to designate land for a specific municipal purpose under § 15A,
a town must either transfer public land from the control of the
select board to another board or impose a deed restriction on
the land.  We conclude that the totality of the circumstances
test articulated in Smith, 478 Mass. at 63-64, should be applied
to determine whether a town has designated land for a specific
use under § 15A.

In support of our conclusion, we draw upon the common-law
doctrine of prior public use.  Under that doctrine, land devoted
to one public use cannot be diverted to another, inconsistent
public use without plain and explicit legislation authorizing
the diversion.  See Sudbury v. Massachusetts Bay Transp. Auth.,
485 Mass. 774, 783 (2020) ("The doctrine of prior public use is
a firmly established creation of the common law, dating back to
the Nineteenth Century.  Under this doctrine, public lands

devoted to one public use cannot be diverted to another inconsistent public use . . ." [quotation and citation omitted]).[7]

Article 97 of the Amendments to the Massachusetts Constitution, adopted in 1972, is a constitutional codification of the common-law prior public use doctrine that affords protections to public lands held for conservation.  Under art. 97, "[l]ands and easements taken or acquired for [conservation] purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two-thirds vote, taken by yeas and nays, of each branch of the general court."

First enacted in 1951,[8] G. L. c. 40, § 15A, embodies the same legal principle -- land designated for one use may not be diverted for an inconsistent use absent explicit determination

---

[7] The prior public use doctrine protects all public land, resolving potential disputes over intergovernmental transfers. See, e.g., Selectmen of Braintree v. County Comm'rs of Norfolk, 399 Mass. 507, 511 (1987) (use of hospital grounds for prison improper where land was obtained for purpose of constructing hospital); Bauer v. Mitchell, 247 Mass. 522, 528 (1924) ("The appropriation by the county commissioners as trustees of the hospital of land bought for and dedicated to the uses of the school . . . [for use as a leaching field for the hospital] was without legal right"); Higginson v. Treasurer & Sch. House Comm'rs of Boston, 212 Mass. 583, 591 (1912) (land devoted to parkland could not be used to construct schoolhouse); Old Colony R.R. v. Framingham Water Co., 153 Mass 561, 563 (1891) (where land was previously appropriated for specific public use, municipal corporation could not take land for another use without explicit legislative authorization).

[8] See St. 1951, c. 798, § 4.

that the land is no longer needed for such use by the relevant municipal board in charge of the land and a two-thirds vote by the town authorizing the diversion.  Indeed, much like art. 97, § 15A, in pertinent part, provides that "[w]henever a board . . . having charge of land . . . constituting the whole or any part of an estate held by a city or town for a specific purpose . . . [determines] that such land is no longer needed for such purpose . . . the town by a two thirds vote . . . may transfer . . . such land . . . for another specific municipal purpose." As such, the plain language of § 15A makes clear that if the Wildcat land is held for the specific municipal purpose of affordable housing, it cannot be diverted to an inconsistent use of conservation until a diversion has been approved pursuant to § 15A.

While the case law establishing the standard for assessing specific-use designations under § 15A is scarce, this court has addressed the corresponding standard under art. 97 on several occasions.  Because art. 97 imposes similar restrictions to those in § 15A on land that has been designated for conservation purposes, our decisions in cases involving art. 97 provide a useful framework for determining specific municipal use designations under § 15A.

Accordingly, this case requires us to reconcile our reasoning in three cases -- Harris, Selectmen of Hanson, and

Smith -- that touch upon these standards.  In Harris, 392 Mass. at 243, we clarified the relationship between G. L. c. 40, § 15A, and G. L. c. 40, § 3.  However, because the issue in Harris was whether land taken by eminent domain for school purposes was in the charge of the school committee absent a separate vote placing the land in the committee's control, the Harris decision is silent on what test should be applied to determine whether a town has designated the land for a specific use under § 15A, where, as here, the land was originally acquired for general municipal purposes.  The Selectmen of Hanson and Smith decisions, on the other hand, articulate a totality of the circumstances test for specific-use designations but do so in the context of municipal land held for conservation under art. 97.  However, this distinction is without consequence.  Both G. L. c. 40, § 15A, and art. 97 are codifications of the prior public use doctrine, developed in our common law as a means to resolve potential conflicts over the use of public lands between various governmental entities.  See Sudbury, 485 Mass. at 787.

Indeed, in Selectmen of Hanson, we did not differentiate between G. L. c. 40, § 15A, and art. 97 in our analysis of whether the land at issue had been designated for a specific use.  See Selectmen of Hanson, 444 Mass. at 509 ("Because the [land] was not held for a specific purpose, namely conservation,

compliance with the provisions of art. 97 and G. L. c. 40, § 15A, was not required" [emphasis added]). Thus, our interpretation of what it means to "designate" land for conservation purposes in a manner sufficient to invoke art. 97 protection is helpful in clarifying what it means to "hold" land for a specific municipal purpose within the meaning of § 15A.

In Selectmen of Hanson, 444 Mass. at 504, the town of Hanson acquired title to a parcel by tax taking. Fourteen years later, the Hanson town meeting voted unanimously "'to accept for conservation purposes, a deed, or deeds, to' the locus, [but] no further action was taken by the town in connection with this vote." Id. Although the town vote authorized the select board to transfer the land to the conservation commission or execute a deed imposing a conservation restriction, the select board retained control of the property, which was never used for conservation. Id. Some twenty-seven years after the town meeting vote, the tax custodian circulated a list of properties to be auctioned, and subsequently sold the land to a third-party purchaser. See id. The town sued the third-party purchaser, arguing that the sale of the land was invalid because the town had not complied with the two-step process set forth in G. L. c. 40, § 15A, to determine that the land was no longer needed for conservation purposes. See id. at 503-504. However, we held that the town meeting vote only "evidenced an intent by the

town to impose a conservation restriction on the locus, and that an instrument creating such a property restriction had to be filed with the registry of deeds in order for the town's interest to prevail over that of any subsequent bona fide purchaser for value."  Id. at 505.

To be clear, the court in Selectmen of Hanson did not adopt, as the plaintiffs argue, a bright-line rule requiring towns to file deed restrictions or transfer control of property to specific entities in order to hold it for a specific purpose under G. L. c. 40, § 15A.  See Selectmen of Hanson, 444 Mass. at 505 ("We agree with the town that the 1971 vote did not have to be filed with the registry of deeds").  See also Mahajan v. Department of Envtl. Protection, 464 Mass. 604, 615 (2013), citing Selectmen of Hanson, supra at 508-509 ("The critical question . . . [is] whether the land was taken for those purposes [identified in art. 97], or subsequent to the taking was designated for those purposes in a manner sufficient to invoke the protection of art. 97").

Indeed, since the Selectmen of Hanson case was decided, we have clarified the standard for specific-use designations under art. 97.  In Smith, 478 Mass. at 50, the issue on appeal was whether a parcel of land owned by the city of Westfield had been dedicated as parkland within the meaning of art. 97, and thus required a two-thirds vote of the Legislature to divert the land

to an inconsistent use.  There was no restriction recorded in the registry of deeds that limited the parcel's use to conservation or recreation purposes.  Id.  We, nonetheless, explicitly declined to interpret Selectmen of Hanson to require recorded deed restrictions to invoke art. 97 protections in all cases.  See id. at 58.  We ultimately concluded that in assessing whether the land was sufficiently designated as parkland to invoke art. 97 protections, courts should apply the following standard:

> "Under our common law, land is dedicated to the public as a public park when the landowner's intent to do so is clear and unequivocal, and when the public accepts such use by actually using the land as a public park.  There are various ways to manifest a clear and unequivocal intent. The recording of a deed or a conservation restriction is one way of manifesting such intent but it is not the only way. . . .
>
> "The clear and unequivocal intent to dedicate public land as a public park must be more than simply an intent to use public land as a park temporarily or until a better use has emerged or ripened.  Rather, the intent must be to use the land permanently as a public park, because the consequence of a dedication is that the general public for whose benefit a use in the land was established . . . obtains an interest in the land in the nature of easement, and upon completion of the dedication it becomes irrevocable." (Quotations and citations omitted.)[9]

_____

[9] The question in Smith, 478 Mass. at 63, whether the public had accepted the dedicated land "by actually using the land as a public park," is inapplicable in this context.  Unlike G. L. c. 40, § 15A, under art. 97, once a city or town offers land it owns for use as a public park, and the public accepts it, the "general public," rather than residents of the particular town, obtains an interest in the land in the nature of an easement. See Smith, supra at 59-60.   Under G. L. c. 40, § 15A, even

Id. at 63.

Given the similarities in the statutory language and the identical common-law roots of art. 97 and G. L. c. 40, § 15A, we hold that the totality of the circumstances test articulated in Smith should likewise be applied in assessing specific-use designations within the meaning of G. L. c. 40, § 15A. That is, in assessing whether land has been designated for a specific municipal use within the meaning of § 15A, courts should consider whether the totality of the circumstances indicate a clear and unequivocal intent to dedicate the land to that purpose.

d. Application. "An order granting . . . summary judgment will be upheld if the trial judge ruled on undisputed material facts and [the] ruling was correct as a matter of law." Commonwealth v. One 1987 Mercury Cougar Auto., 413 Mass. 534, 536 (1992). To succeed on a motion for summary judgment, a moving party "may satisfy [its] burden of demonstrating the absence of triable issue either by submitting evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable

---

where a town dedicates land for a particular municipal purpose, it retains full proprietary interest in the land. Thus, the sole inquiry for the purpose of § 15A designations should be the town's intent to "hold" land for a specific municipal purpose.

expectation of proving an essential element of [his] case at trial" (citation omitted). Hill-Junious v. UTP Realty, LLC, 492 Mass. 667, 672 (2023). "The burden on the moving party may be discharged by showing that there is an absence of evidence to support the non-moving party's case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991).

To prevail at the summary judgment stage, the board had the burden to show that there was no genuine dispute of material fact regarding whether the Wildcat land was dedicated for affordable housing under G. L. c. 40, § 15A, and that it was entitled to summary judgment as a matter of law. As discussed supra, this entails showing the town's clear and unequivocal intent to set aside the property for that specific use. We conclude that the board met its burden, as there are no genuine disputes of material fact concerning the town's intent, even when viewing the evidence in the light most favorable to the plaintiffs, as we must on summary judgment.

The board put forth undisputed evidence showing that the town dedicated the Wildcat land for affordable housing. To begin with, town meeting unanimously voted in 2004 to "make available [the Wildcat land] for affordable housing." While it is true that the 2004 town meeting vote is not, on its own, sufficient to establish a clear and unequivocal intent to set aside the land for affordable housing, it is nonetheless

indicative of such an intent.  See Harris, 392 Mass. at 241 ("The warrant for the special town meeting . . . shows that . . . it was commonly understood that the property remained in the charge of the school committee in the twenty-five years that it had been held by the town").

In addition, the town took several other steps that shed further light on its intent to set aside the Wildcat land for affordable housing.  In 2007, town meeting voted to adopt an affordable housing trust bylaw establishing the trust, a municipal entity whose sole purpose is the development of affordable housing in the town.  In furtherance of its purpose, the trust hired several outside engineering consultants in 2013 and 2019 to delineate the wetlands on the Wildcat land and perform a site assessment of the property for a multiunit affordable housing development.  These consultants prepared a concept plan in 2013 for an affordable housing project on the Wildcat land, which included ten "cottage-style" single-family units.  That same year, the trust ordered a feasibility study on the Wildcat land to assess the site's ability to handle stormwater and wastewater.

In 2019, an outside architectural firm prepared yet another conceptual housing development plan, in which it proposed a potential twenty-six unit affordable housing development.  Later that year, the trust published an update to the town's housing

production plan, which identified the Wildcat land as being "designated for developing affordable housing" and referenced the twenty-six unit 2019 conceptual project design prepared by the architectural firm. Finally, in 2021, the trust met with the board to discuss the development of the Wildcat land. Thus, it is undisputed that, consistent with the 2004 town meeting authorization, the board, primarily through the trust, explored the development of the Wildcat land for affordable housing in several different ways.

Other information presented by town officials corroborates these efforts. For example, the town administrator stated in an affidavit that the town expended considerable public funds to assess the feasibility of affordable housing on the Wildcat land by identifying wetland resource areas, conducting site assessments, and engaging experts to advise the town on what type of affordable housing would be appropriate for the property. The town administrator also stated that, in 2021, before Carroll drafted and submitted the 2021 town meeting article, the trust recommended that the town request proposals from developers to develop affordable housing on the Wildcat land.

Notably, an affidavit from the trust chair provides context concerning the length of time that the board controlled the Wildcat land for affordable housing. Specifically, the trust

chair stated that, although the initial feasibility studies on the Wildcat land were prepared in 2013, the trust decided to place the development of the Wildcat land on hold while it developed an affordable housing project at a different location. The 2019 update to the housing production plan further elucidates why the development of the Wildcat land was temporarily put on hold -- "[t]he property's slope and infrastructure demands in the project design drove up projected costs considerably," thereby informing the trust's decision to develop another property first.  However, that is not to say that the town was abandoning the development of affordable housing on the Wildcat land; instead, consistent with the town administrator, the trust chair asserted that when the other affordable housing project was near completion in 2018, the trust moved forward with preparing a conceptual development design plan for the Wildcat land in 2019.

Moreover, the chair stated that, after the 2021 town meeting vote, the board asked the trust to consider whether the Wildcat land was still needed for affordable housing.  The trust then voted unanimously that the Wildcat land was still needed for that purpose, since the town's affordable housing inventory was far below ten percent, a threshold requirement under G. L. c. 40B, § 20, and the Wildcat land was the only town-owned property not designated for other purposes.

Taken together, this evidence shows that following the 2004 town meeting vote, the board, acting primarily through the trust, took several steps to explore the use of the Wildcat land for affordable housing. This evidence also indicates that, since the 2004 town meeting vote, the board considered the Wildcat land to be set aside for a specific municipal use, affordable housing, to the exclusion of all other uses.

Because the board produced undisputed evidence showing that the town intended to designate the Wildcat land for affordable housing, the crucial question is whether the plaintiffs have produced any evidence to create a material dispute of fact regarding the town's intent. See Barbetti v. Stempniewicz, 490 Mass. 98, 116 (2022) ("If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment" [citation omitted]). While it is certainly true that courts do not usually reach the factual question of intent at the summary judgment stage, the plaintiffs did not produce any evidence to create a material dispute of fact as to whether the board intended to hold the Wildcat land for affordable housing. See e.g., National Assn'n of Gov't Employees, Inc. v. Central Broadcasting Corp., 379 Mass. 220, 231 (1979) (party against whom summary judgment is sought not

entitled to trial simply because cause of action has state of mind as material element; there must be some indication that opposing party can produce requisite quantum of evidence to support its claim).

Indeed, instead of pointing to specific evidence in the record, the plaintiffs relied on mere allegations and conclusory denials, which cannot defeat summary judgment. For example, in its statement of material facts, the board asserted that the trust placed the development of the Wildcat land on hold while it developed an affordable housing project on another property. In responding to this statement, the plaintiffs merely asserted that this material fact was disputed, as "information regarding this assertion [was] solely within the possession, custody, and control of [the defendants], and discovery [was] ongoing."

A fact is not disputed merely because it has been denied by a nonmoving party. See Adams, 492 Mass. at 287. See also Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 804 (2014) ("Bare assertions made in the nonmoving party's opposition will not defeat a motion for summary judgment"). Rather, an affirmative response by an opposing party is crucial to its ability to survive a motion for summary judgment. Indeed, the requirement of an affirmative response, supported by specific facts, by the party opposing

summary judgment is spelled out in the rule itself. Under Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974):

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth <u>specific facts</u> showing that there is a genuine issue for trial" (emphasis added).

Mere denials coupled with a nonmoving party's hope that something will materialize in discovery will not prevent a court from ordering summary judgment. As such, the plaintiffs' vague and general statements are wholly inadequate. See <u>LaLonde</u> v. <u>Eissner</u>, 405 Mass. 207, 209 (1989) (party cannot rest on mere assertions of disputed facts to defeat motion for summary judgment).

Despite their inadequate responses to the board's statement of material facts, the plaintiffs now point to evidence in the summary judgment record to support their position that the Wildcat land was held as part of the town's general corporate property under G. L. c. 40, § 3. Specifically, they point to the following evidence: (1) an affidavit by one board member stating that, in 2005, the board rejected a private developer's proposal to construct affordable housing on the Wildcat land; (2) meeting minutes of the board showing that, in 2009, the board granted a revocable license to a private developer to construct a walking path across a portion of the Wildcat land

close to the boundary of Wildcat Hill; and (3) the length of time that has passed since the board initially made the Wildcat land available for affordable housing in 2004, without the board actually developing the land for that purpose or transferring the Wildcat land to the trust's custody. None of this evidence, even when viewed in the light most favorable to the plaintiffs, creates a genuine issue of material fact for purposes of the board's motion for summary judgment.

According to the board member's affidavit, a member of the town's master plan committee met with a private developer in 2005 and discussed the idea of granting the developer permission to construct a roadway over the town-owned property in exchange for the developer constructing affordable housing units on the Wildcat land. However, after this proposal was brought to the board, the board was "not interested in such an arrangement." Because the board rejected this single proposal, the plaintiffs ask us to infer that the board was not interested in constructing affordable housing on the Wildcat land. Such an inference is a bridge too far.

In evaluating a motion for summary judgment, a court makes "all logically permissible inferences" in favor of a nonmoving party. See Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 203 (1991). Thus, a court should not indulge a nonmoving party's inferences if they do not "flow rationally

from the underlying facts" (citation omitted). Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995). The inference that the plaintiffs ask us to make -- that the board was not interested in any proposal to build affordable housing -- is not logically permissible where the board was merely declining a single proposal that was contingent on a condition unrelated to any intent to develop affordable housing (i.e., the construction of a roadway). This inference is even more tenuous considering that the board's rejection of this proposal predates subsequent actions by the town that show a continued interest in using the Wildcat land for affordable housing -- such as conducting studies to determine whether it was feasible to use the property for affordable housing.

The plaintiffs also contend that granting a revocable license to construct a walking path over a small portion of the Wildcat land shows that the board intended to hold the entire parcel for another purpose -- public recreation -- rather than intending to hold the land exclusively for affordable housing. However, "[a] license merely excuses acts done by one on land in possession of another that without the license would be trespasses, conveys no interest in land, and may be contracted for or given orally." Baseball Publ. Co. v. Bruton, 302 Mass. 54, 55 (1938). Further, a license is freely revocable at the will of the promisor. See Spencer v. Rabidou, 340 Mass. 91, 93

(1959). Therefore, an inference that granting a revocable license to build a trail on a small portion of the Wildcat land indicates that the board intended to hold the entire six-acre parcel for the purpose of recreation is unreasonable because the board was free to revoke the license at any time. Further, this inference is even less rational considering the town administrator's affidavit, which states that the trail was approved next to the boundary line so that it would not interfere with the development of the rest of the Wildcat land.

Lastly, the mere fact that the Wildcat land remained undeveloped and under the control of the board, as opposed to the trust, for approximately thirty years does not create a material dispute of fact as to the town's intent. First, as discussed in Harris, 392 Mass. at 243, the two-step procedure required by G. L. c. 40, § 15A, applies even if "the land [held for a specific municipal purpose] was in the charge of the selectmen rather that another board or officer." Thus, the plain language of § 15A does not require the board to transfer the custody of the land held for a specific municipal purpose to another board or officer. See id. Stated differently, the dispositive question is not which municipal entity retained custody of the Wildcat land, but whether, under the totality of the circumstances, the town intended to hold the land for the specific municipal purpose of affordable housing.

Further, the delay in the development of the Wildcat land does not indicate the town's intent to hold it as a part of the town's general corporate inventory. Indeed, the record evidence suggests that the delay was caused by factors other than the town's lack of interest in using the Wildcat land for affordable housing. In particular, the trust's 2019 update to the town's housing production plan indicates that the Wildcat land's "slope and infrastructure demands" drove up the projected costs of the development, prompting the town to set the development of the Wildcat land on hold. The update further states that the town was only then, in 2019, revisiting the wildcat property project after finishing a similar development elsewhere. This evidence suggests that the practical, topographic difficulties associated with developing the Wildcat land informed the trust's decision to develop another town-owned property first and revisit the Wildcat land development plans later. Thus, the mere fact that the property remained undeveloped does not support the plaintiffs' suggested inference. See Harris, 392 Mass. at 242 ("To require town boards in control of land to [develop the land] would encourage unnecessary and premature development and preclude careful planning for future needs").

Even taken together, (i) the town's rejection of a developer proposal for affordable housing, (ii) the grant of a revocable license for a walking path, and (iii) the length of

time it has taken to develop affordable housing on the Wildcat land do not support a rational inference that the board did not intend to hold the Wildcat land exclusively for affordable housing purposes.  As we explained supra, the inferences that the plaintiffs have asked us to make in response to these facts, individually, are improbable.  Given that each separate inference is on its own improbable, combining them together cannot defeat summary judgment.  See e.g., Grant's Dairy-Me., LLC v. Commissioner of Me. Dep't of Agric., Food & Rural Resources, 232 F.3d 8, 23 (1st Cir. 2000) ("Despite the generosity of [the summary judgment] standard, conclusory allegations, improbable inferences, and unsupported speculation are entitled to no weight" [quotation and citation omitted]); Barwick v. Celotex Corp., 736 F.2d 946, 962 (4th Cir. 1984) (rejecting plaintiff's "attempt[] to build one vague inference upon another vague inference to produce a factual issue").[10]

---

[10] We note that because the Massachusetts rules of civil procedure were patterned on the Federal rules of civil procedure, it is well established that we may take guidance from the relevant Federal jurisprudence in construing rule 56 (e). See Rollins Envtl. Servs., Inc. v. Superior Court, 368 Mass. 174, 179-180 (1975) ("This court having adopted comprehensive rules of civil procedure in substantially the same form as the earlier Federal Rules of Civil Procedure, the adjudged construction theretofore given to the Federal rules is to be given to our rules, absent compelling reasons to the contrary or significant differences in content").

e.  <u>Continuance to obtain further discovery</u>.  In the alternative, the plaintiffs contend that the motion judge abused his discretion in granting the board's cross motion for summary judgment without permitting them an opportunity to first engage in discovery.  We are not persuaded.

"A continuance is appropriate if the party opposing a summary judgment motion shows that it cannot, without further discovery, 'present by affidavits facts essential to justify [its] opposition.'"  <u>Commonwealth</u> v. <u>Fall River Motor Sales, Inc</u>., 409 Mass. 302, 307 (1991), quoting Mass. R. Civ. P. 56 (f).  Rule 56 (f) requires a nonmoving party to file an affidavit explaining the reasons why he or she cannot present facts to justify his or her opposition and requesting a continuance to obtain further discovery.  See <u>Herbert A. Sullivan, Inc</u>. v. <u>Utica Mut. Ins. Co</u>., 439 Mass. 387, 400-401 (2003) ("Had [the party opposing summary judgment] filed such an affidavit and obtained a continuance of the summary judgment proceedings, it could have gone forward with discovery and secured necessary evidence to support its . . . claim"); <u>First Nat'l Bank</u> v. <u>Slade</u>, 379 Mass. 243, 244-245 (1979) (failure to file rule 56 [f] affidavit or to explain failure was "fatal" to argument for opportunity to obtain discovery).  See also <u>Coastal Orthopaedic Inst., P.C</u>. v. <u>Bongiorno</u>, 61 Mass. App. Ct. 55, 61

n.8 (2004) (informal request asking for additional discovery is nullity absent affidavit requesting continuance).

The plaintiffs did not file an affidavit requesting a continuance as required by rule 56 (f). They, nevertheless, assert that their "repeated and consistent objections in this case are more than sufficient to invoke [r]ule 56(f)." The plaintiffs overstate these objections. While they did respond to some of the board's statements of material facts suggesting that the town was in the possession of the relevant information and that discovery was "ongoing," a request for continuance to obtain additional discovery in accordance with rule 56 (f) must be presented explicitly; it is not on the motion judge to infer whether the plaintiffs' vague objections to the board's statement of undisputed facts functioned as a request for more discovery. Moreover, in February 2022, at a case management conference before the Land Court, "[t]he parties agreed that fact discovery [was] not required in this case because there [were] no disputes of material fact."

A request made pursuant to rule 56 (f), together with the supporting affidavit, must point to the issues of material fact, and set forth both (i) the additional discovery an opposing party needs and (ii) how much time the party needs to develop the facts essential to its opposition. See Slater v. Traynor Mgt., Inc., 101 Mass. App. Ct. 705, 709-710 (2022). Here, the

plaintiffs' responses did not specify what additional discovery they needed, nor how much time they needed to complete it.

For these reasons, the plaintiffs' right to further discovery was waived. See Herbert A. Sullivan, Inc., 439 Mass. at 401 ("By failing to invoke rule 56 [f], [the party opposing summary judgment] waived its right to further discovery before the judge issued his decision on [the] motion for summary judgment"). Accordingly, the motion judge did not abuse his discretion in granting the board's motion for summary judgment without ordering further discovery. See Alake v. Boston, 40 Mass. App. Ct. 610, 612 (1996) (plaintiff failed to present materials to motion judge demonstrating that there was genuine issue for trial or, alternatively, invoke rule 56 [f] to seek additional discovery).

3. Conclusion. Based on the undisputed facts, the Wildcat land was held exclusively for a specific municipal purpose -- the development of affordable housing -- within the meaning of G. L. c. 40, § 15A. Accordingly, we affirm the Land Court's decision on the parties' cross motions for summary judgment.

Judgment affirmed.